David A. Cortman, AZ Bar No. 029490
Jonathan A. Scruggs, AZ Bar No. 030505
Ryan J. Tucker, AZ Bar No. 034382
Katherine L. Anderson, AZ Bar No. 033104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (Fax)
dcortman@adflegal.org
jscruggs@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
35865 Sunset Park St.
Soldotna, Alaska 99669
(907) 262-7846
(907) 262-7872 (Fax)
sredmond@greatlandjustice.com

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

|  |  |
|---|---|
| THE DOWNTOWN SOUP KITCHEN d/b/a DOWNTOWN HOPE CENTER, <br><br>     Plaintiff, <br><br> v. <br><br> MUNICIPALITY OF ANCHORAGE, ANCHORAGE EQUAL RIGHTS COMMISSION, and PAMELA BASLER, Individually and in her Official Capacity as the Executive Director of the Anchorage Equal Rights Commission, <br><br>     Defendants. | Case No. <br><br> **<u>VERIFIED COMPLAINT</u>** |

# INTRODUCTION

1.      This challenge seeks to protect the right of a faith-based homeless shelter to exercise its religious beliefs and to speak about those beliefs so that it can help homeless and hurting women in downtown Anchorage.

2.      The Downtown Soup Kitchen d/b/a Downtown Hope Center ("Hope Center") is a private, faith-based, non-profit organization that offers free religious teaching, food, and safe shelter to a limited number of homeless women who must first satisfy certain requirements, and many of whom have been abused by men and want to escape sex-trafficking.

3.      The Hope Center's motto is "Hope Restored • Hearts Renewed • Lives Transformed."

4.      But Anchorage[1] is interpreting its laws to force the Hope Center to admit men into its women's shelter and to stay silent about the differences between men and women.

5.      That violates Anchorage's own laws and the Constitution.

6.      The practical result of this enforcement would be not only to force a religious ministry to abandon its mission and message but also to force homeless women to sleep alongside and interact with men in intimate settings—even though those women may have just been beaten, raped, and sexually assaulted by a man the day before.

7.      Anchorage is doing all this under the guise of its public accommodation and fair housing law, Anchorage Municipal Code, Title 5, § 5.20.050 and § 5.20.020.

8.      The former makes it illegal for public accommodations to:

- "deny" "accommodations" and "services" on the basis of sex or gender identity;

- "[p]ublish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement" that "states or implies" that any of its

---

[1] The term "Anchorage" refers to all Defendants unless context indicates otherwise.

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

accommodations would be "refused" or "withheld" to a person based on their sex or gender identity; and

- publish a statement that "states or implies" that a person's "patronage or presence" belonging to a particular sex or gender identity would be "unwelcome, not desired, not solicited, objectionable or unacceptable."

9.     And the latter makes it illegal for owners, lessors, managers, or agents to:

- "[c]irculate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use, sale, lease or rental of real property that indicates any preference, limitation, specification or discrimination based on" sex or gender identity.

10.     But the Hope Center is not a public accommodation, either under the law or under the specific exemption found in the code. *See* § 5.25.030(A)(9) (This chapter "shall not apply to…shelters for the homeless."); *and see* § 5.20.020(A) ("With the exception of those conditions described in section 5.25.030A, as 'lawful practices', it is unlawful…").

11.     And the Hope Center is not selling or leasing any real property. It is helping the homeless free of charge.

12.     Nevertheless, Anchorage is currently investigating the Hope Center for violating its law in January 2018 when the Hope Center directed someone away from its women's shelter to a hospital—even paying for transportation—because that individual was injured, inebriated, and past check-in time for the shelter.

13.     So that action was based on intoxication and late arrival, not any protected category. In fact, the Hope Center has never once turned anyone away from its shelter on the basis of gender identity.

14.     The individual who sought access in January 2018 nonetheless filed a complaint with the Anchorage Equal Rights Commission ("Commission"), accusing the Hope Center of

discriminating on the basis of sex and gender identity, despite clear evidence of the non-discriminatory basis for that denial.

15.    Although the Hope Center clearly did not violate the code, the Commission's Executive Director did not dismiss the complaint early on but continues to harass the Center through a now nearly 6 month "investigation."

16.    And during that investigation, the Executive Director initiated *another* complaint against the Hope Center, and this time included Brena, Bell & Clarkson—*the law firm for Hope Center's then attorney*. In this complaint, the Director accused the Hope Center and its attorney of violating the public accommodation and fair housing law because the attorney discussed the first complaint against the Hope Center with news reporters who asked about a local referendum that would decide if biological men could access opposite-sex restrooms.

17.    By pursuing this frivolous claim, Anchorage forced the Hope Center to obtain new counsel.

18.    Meanwhile, the Hope Center filed motions challenging the Commission's jurisdiction in both of the complaints brought against it—the first motion brought nearly 4 months ago. Yet the Commission has still refused to rule on those motions or issue a determination of no substantial evidence. Instead, the Commission is continuing to engage in irrelevant, overreaching, and harassing discovery.

19.    As these events prove, Anchorage is not interested in investigating a past violation of its law; it is harassing the Hope Center in bad faith, pressuring the Hope Center to change its policy and to stay silent when the Hope Center has done nothing illegal.

20.    These investigations prove that Anchorage is using its law—a law which contains an express exemption for homeless shelters—and will continue to use this law in the future to

force the Hope Center to change its faith-based policies, to allow biological men into its women's shelter, and to stay silent about its religious beliefs.

21.     To stop this imminent irreparable harm, the Hope Center asks this Court to enjoin future enforcement of parts of the Anchorage Municipal Code and to declare specific sections unconstitutional, so that the Hope Center may freely speak its beliefs, freely exercise its faith, and freely serve hurting women who deserve a safe place to sleep in Anchorage.[2]

## JURISDICTION AND VENUE

22.     This civil rights action raises federal questions under the United States Constitution, particularly the First and Fourteenth Amendments, and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

24.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367.

25.     This Court has authority to issue the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Federal Rule of Civil Procedure 57; the requested injunctive relief under 28 U.S.C. § 1343 and Federal Rule of Civil Procedure 65; the requested damages under 28 U.S.C. § 1343; and reasonable attorneys' fees and costs under 42 U.S.C. § 1988.

26.     Venue lies in this district pursuant to 28 U.S.C. § 1391(b) because all events giving rise to the claims detailed here occurred within the District of Alaska and the Defendants reside in the District of Alaska.

---

[2] The Hope Center is not, at this time, challenging the current investigations against the Hope Center and its attorney, but may move to amend if that challenge becomes necessary.

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

**PLAINTIFF**

27.     Plaintiff The Downtown Soup Kitchen a/k/a Downtown Hope Center is a non-profit, religious entity organized under the laws of the State of Alaska, with a principal place of business at 240 E. 3rd Avenue, Anchorage, Alaska 99501.

**DEFENDANTS**

28.     The Municipality of Anchorage ("Anchorage") is a home rule municipality organized under the laws of the State of Alaska, and is subject to suit under AS 29.35.010 and the common law.

29.     The Anchorage Equal Rights Commission ("the Commission") is an administrative agency within the Municipality of Anchorage.

30.     Pamela Basler ("Basler") is a citizen of Alaska and the Executive Director of the Commission. Her authority is delegated to her by the Commission.

31.     Basler is sued individually, and in her official capacity as Executive Director of the Commission.

32.     All actions taken by Anchorage officials in this complaint were taken on behalf of, with the authority of, and to act on behalf of Anchorage.

33.     Anchorage approved of, acquiesced in, and/or supported the actions of the Anchorage Equal Rights Commission.

34.     All actions taken by Defendants, including the violations of the Hope Center's constitutional rights, were the result of a policy, ordinance, regulation, or decision officially adopted and promulgated by Defendants and/or their officers and were actions also taken under color of law by policy and/or decision makers.

# FACTUAL BACKGROUND

**The Hope Center's History**

35.     The Hope Center was prompted by the vision of a few Anchorage church leaders who wanted to share God's love with Anchorage's homeless.

36.     Formed over thirty years ago, the Hope Center provides food and showers to homeless individuals in the downtown Anchorage area and provides shelter to homeless women, many of whom have been abused or battered by men.

37.     Operating out of a little red house on Fourth Avenue in downtown Anchorage, the Hope Center initially provided nearly 300 free cups of soup each day to homeless and low-income families.

38.     It also offered free showers and free clothing handouts from a yellow A-frame located next door.

39.     In 2012, the Hope Center moved into its new facility on Third Avenue in downtown Anchorage.

40.     The Hope Center later expanded its mission to include assisting the Brother Francis Shelter (the "Francis Shelter"), a program of Catholic Social Services that provides free emergency shelter for individuals in Anchorage who are without a home.

41.     The Francis Shelter often had to shelter more homeless individuals than its facilities could accommodate and faced the challenge of trying to provide a safe shelter environment for homeless women, many of whom had been abused or battered by men on the streets or otherwise.

42.     The Francis Shelter and the Hope Center therefore agreed that the Hope Center would assist the Francis Shelter by taking in and providing safe shelter to the Francis Shelter's

overflow of homeless women who presented themselves at and who otherwise qualified for shelter at the Francis Shelter.

43.     Originally, the Francis Shelter checked individuals in and then the Hope Center would transport the overflow of women from the Francis Shelter to the Hope Center.

44.     But the Anchorage homeless community eventually learned of the Hope Center's "shelter" and began appearing at Hope Center directly.

45.     For its shelter, the Hope Center now accepts both an overflow of homeless women from the Francis Shelter, as well as some homeless women who either appear at or are referred to the Hope Center directly.

46.     The Hope Center can provide shelter to fifty homeless women at any given time.

47.     Of the women the Hope Center provides shelter to, most of these women have been abused or battered or escaped from sex trafficking.

48.     Because of its limited space and its religious mission, the Hope Center shelter only accepts biological women to protect the physical, psychological, and emotional safety of the women seeking refuge from abuse, primarily from men.

49.     The Hope Center also gives priority to the elderly and disabled.

50.     To gain entry, the Hope Center shelter guests must first check in and meet many conditions.

**The Hope Center's Religious Beliefs**

51.     The Hope Center is a faith-based, non-profit organization.

52.     The Hope Center's mission statement is "[i]nspired by the love of Jesus, we offer those in need support, shelter, sustenance, and skills to transform their lives."

8

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

53.     The Hope Center does this both through acts of service and through the inculcation of Christian beliefs and values.

54.     The Hope Center believes that Jesus' transforming love can free people of destructive situations, habits, and addictions.

55.     The Hope Center believes that the Bible teaches that God creates people male or female.

56.     The Hope Center believes that a person's sex (whether male or female) is an immutable God-given gift and that it is wrong for a person to deny his or her God-given sex.

57.     The Hope Center believes that women should be cherished, respected, and protected.

58.     The Hope Center's sincerely held religious belief is that it should convey and promote messages about God's creation of each unique individual, whether male or female, and that it should not convey conflicting messages.

59.     The Hope Center's sincerely held religious belief is that it should be loving, upfront, and honest in its interactions with others.

60.     It would not only be dangerous and against common sense, but it would violate the Hope Center's sincerely held religious beliefs to admit biological men into its shelter and allow them to sleep side by side and disrobe next to women, some of whom have been assaulted by men and fear for their safety.

61.     The Hope Center's sincerely held religious belief is that it should care for women who lack shelter.

62.     The Hope Center's sincerely held religious belief is that those providing shelter to homeless women play a critical role in their understanding of God's design for them.

9

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

63.     The Hope Center believes that an environment allowing a biological male to sleep with and disrobe next to abused and battered females is not as ideal as an environment that allows those females to sleep in a room with members of the same biological sex.

64.     To be true to its beliefs, teaching, mission, and values, the Hope Center must abide by its Christian beliefs in how it operates, including in what it teaches and how it treats others.

**The Hope Center's Operations**

65.     The Hope Center's purpose is religious.

66.     Inspired by the love of Jesus, the Hope Center fulfills its religious mission in serving and teaching the poor.

67.     The Hope Center guests must be willing to be exposed to Christian teachings and not disrupt meetings inculcating Christian values.

68.     The Hope Center guests are offered Christian counseling, teaching, and advice provided by staff and leaders associated with the Hope Center.

69.     These activities include, but are not limited to, group prayer before meals, Bible studies, group devotions, Christian music and television, signs and decor with Christian messages, teachings, and symbols.

70.     The Hope Center hopes that by loving, serving, and teaching the homeless, hurting, and poor, the Hope Center encourages those it serves to put their faith in Jesus and free themselves from destructive addictions and habits.

71.     While not currently posted, the Hope Center desires to post, publish, or circulate its admittance policy or a portion thereof not only for clarity, but for peace of mind to those

seeking refuge from the harsh conditions of homeless life and also so that it can fulfill its religious desire to be upfront and honest with those seeking access to the shelter.

72.     According to that policy, the Hope Center shelter guests must be biological females, at least 18 years of age, not demonstrate dangerous behavior, be clean and sober, be exposed to or attend prayer meetings and devotionals, be able to meet their personal needs without assistance, and must respect shelter guidelines.

73.     No Hope Center policy prohibits biological women who identify as men from accessing the shelter.

74.     In fact, the Hope Center has allowed and is currently allowing biological women who identify as men to access its shelter.

75.     Shelter guidelines at the Hope Center also include prohibitions against smoking, fighting, foul language, and wandering, as certain areas of the facility are off limits.

76.     In addition, all shelter guests at the Hope Center must sign up for a chore, assist with clean-up at the facility, and adhere to a schedule.

77.     No shelter guest at the Hope Center is allowed to stay in the shelter without complying with its procedures.

78.     The Hope Center has one large open room in which it provides dinner to the homeless women.

79.     After dinner, the homeless women who have signed up and qualify are permitted to stay the night, based upon space availability and priority of sign-up time and satisfaction of the shelters conditions and guidelines.

80.     Those who stay for the night at the Hope Center are given mats, along with a bag of blankets and a sheet, so that they can sleep on the floor in the one large open room where women sometimes change or are in various states of undress.

81.     Showers and laundry are also provided to those who have signed up and qualified to stay the night, and breakfast is provided in the morning to those who stayed the previous night.

82.     On Saturdays, shelter guests at the Hope Center are monitored by volunteers.

83.     The Hope Center's Saturday shelter policy is that no one is allowed in the building to participate in the day shelter unless they have stayed in the shelter the night before, having checked in and gone through a bag check.

84.     True and correct copies of those Hope Center shelter policies are attached as Exhibit 1 and Exhibit 2.

85.     Saturday check-in time at the Hope Center for new guests is at 5:45 p.m.

86.     In addition to providing charitable food and shelter, the Hope Center maintains a church on its property.

87.     Further, other homeless shelters in the Anchorage area accept biological males.

88.     The Hope Center has and will continue to direct any biological males who seek access to its women's shelter to those other shelters.

**The Hope Center's Interaction with "Jessie Doe"[3]**

89.     On Friday, January 26, 2018, at about 6:00 p.m., "Jessie Doe" ("Doe") was dropped off at the Hope Center by officers of the Anchorage Police Department.

---

[3] The real name of the complainant is not disclosed in this filing to address privacy concerns.

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

90.	Sherrie Laurie ("Laurie"), Hope Center's Executive Director, was called to the Dining Hall, which also serves as the sleeping area for the homeless women's shelter, to discern the course of action to be taken about Doe.

91.	Doe smelled strongly of alcohol and also had an open wound above Doe's eye.

92.	Doe acted very agitated and was aggressive in body language.

93.	The Hope Center is a sober and clean shelter. No one is allowed to stay in the Hope Center shelter if inebriated or high.

94.	Laurie informed Doe that the Hope Center did not accept individuals who were inebriated, under the influence of alcohol or drugs, and that Doe could not stay at Hope Center for that reason.

95.	Laurie was eventually informed by the Francis Shelter that Doe had initiated a very disruptive fight at the Francis Shelter, that the police had been called to handle the situation, and that Doe had been banned from the Francis Shelter property until July 4, 2018.

96.	Laurie recommended that Doe go to the hospital to receive medical care for the wound over Doe's eye.

97.	Following much resistance, Doe agreed to go to the hospital, and Laurie paid for a cab to take Doe to the emergency room.

98.	The Hope Center did not see Doe again that evening.

99.	The next day, on Saturday, January 27, 2018, around 2:00 p.m., Doe showed up at Hope Center again and sought to be admitted.

100.	Doe was not admitted, however, because Doe had not stayed the previous evening which is required by Shelter policy and because Doe sought entry at a time when the shelter was not accepting new guests.

101. Doe was asked to leave the Hope Center property because the Hope Center, as a courtesy to neighbors, does not allow loitering.

102. Doe left the Hope Center and never returned.

103. Doe later filed a complaint with the Commission claiming that the Hope Center had discriminated against Doe on the basis of sex and gender identity under the Anchorage Municipal Code.

**The Anchorage Municipal Code**

104. The Commission was established by Section 17.02 of the Anchorage Municipal Charter. AMC § 5.10.020.

105. It is an administrative agency within the Municipality of Anchorage.

106. Section 17.02 of the Anchorage Municipal Charter states that "[t]he assembly by ordinance shall establish an equal rights commission and prescribe its duties. The commission shall appoint its principal executive officer with the approval of the mayor. The principal executive officer shall serve at the pleasure of the commission."

107. The Commission is authorized to hire an Executive Director, subject to the approval of the mayor, who serves at the pleasure of the Commission. AMC § 5.10.040.

108. The Commission may delegate to the Executive Director of the Commission all powers and duties given by Title 5 of the AMC, except the power to hold public hearings, issue orders, and hire the executive director. AMC § 5.10.040(11).

109. The Executive Director of the Commission has the power to initiate, dismiss, and administratively close complaints, initiate a civil action for injunctive relief, make determinations that a complaint is or is not supported by substantial evidence, initiate general investigations, issue discovery to a party, issue subpoenas, proceed with civil remedies,

14
*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

substitute herself in for a complainant in a case, and determine whether conciliation efforts have failed. AMC §§ 5.40.010, 5.40.060, 5.50.030, 5.50.060, 5.50.070, 5.50.080, 5.60.010, 5.60.020, 5.60.050, 5.80.010.

110.    The Chair of the Commission is the duly elected chairperson of the Commission, and has the power to rule on discovery objections and subpoenas, proceed with civil remedies, rule on requests for reconsideration, appoint hearing panels, rule on challenges to commissioner appointments. AMC §§ 5.20.010, 5.50.070, 5.50.080, 5.70.040.

111.    Anchorage's public accommodation law is found in AMC, Title 5, which was amended in 2015 to include "gender identity" to the grounds of discrimination prohibited by the title. AMC § 5.20.050.

112.    AMC § 5.20.010 defines "gender identity" as "a person's gender-related self-identity, as expressed in appearance or behavior, regardless of the person's assigned sex at birth. A person's gender identity may be established by evidence of medical history, care or treatment of the gender identity, consistent and uniform assertion of the gender identity, or other evidence that the gender identity is sincerely held, core to a person's gender-related self-identity, and not being asserted for an improper purpose."

113.    The terms and phrases such as "evidence of medical history," "consistent," "uniform," and "improper purpose" are not defined and the ordinance does not provide further guidance on how to interpret or enforce these terms.

114.    AMC § 5.20.050 makes it illegal for public accommodations to: (1) refuse or deny any of its accommodations, facilities, or services on the basis of sex or gender identity; (2) "[p]ublish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement" that "states or implies" that any of its accommodations would be "refused" or

"withheld" to a person based on their sex or gender identity; and (3) publish a statement that "states or implies" that a person's "patronage or presence" belonging to a particular sex or gender identity would be "unwelcome, not desired, not solicited, objectionable or unacceptable."

115.    The terms and phrases such as "implies that," "unwelcome," "not desired," "not solicited," "objectionable," and "unacceptable" are not defined and the ordinance does not provide further guidance on how to interpret or enforce these terms.

116.    AMC § 5.20.010 defines "public accommodation" as "any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general public, subject only to the conditions and limitations established by law and applicable alike to all persons."

117.    In cases involving public accommodations, the Commission may order any equitable relief, including but not limited to admission or service in a place of public accommodation, and any other relief deemed appropriate by the Commission.

118.    Although the Hope Center has repeatedly denied that it is a "public accommodation" and provided evidence accordingly, Anchorage continues to interpret its public accommodation law to include the Hope Center.

119.    The Anchorage Municipal Code also includes a section titled "Unlawful practices in the sale, rental or use of real property," which provides in relevant part that: "[I]t is unlawful for the owner, lessor, manager, agent, brokerage service, or other person having the right to sell, lease, rent, advertise, or an owner's association having the powers of governance and operation of real property to … [perform certain prohibited acts]." AMC § 5.20.020(A).

120.    The practices prohibited in AMC § 5.20.020 are subject to important exemptions set out in AMC § 5.25.030. "[C]onditions described in section 5.25.030(A). as 'lawful practices'" are not subject to this chapter.

121.    One of the exemptions in section 5.25.030(A) states that the chapter shall not apply to the "establishment of same-sex dormitories or portions thereof by educational facilities, provided that such establishment shall not discriminate among its residents on the basis of race, color, religion, national origin, marital status, age, physical or mental disability, or familial status." AMC § 5.25.030(A)(8).

122.    Another exemption in section 5.25.030(A) states that the chapter shall not apply to [t]he establishment of a … shelter … or residential facility for the care and lodging of persons in need of special medical, rehabilitative, social, or psychological support, including, but not limited to … **shelters for the homeless**." AMC § 5.25.030(A)(9) (emphasis added).

123.    A finding of a discriminatory housing violation may result in issuance of an order that includes, but is not limited to, actual damages, injunctive relief, and civil penalties not exceeding $11,000 if the respondent has not been adjudged to have committed any earlier discriminatory housing practice.

124.    Despite the Hope Center's objection and a clear exemption in the ordinance, Anchorage has likewise interpreted AMC § 5.20.020(A)(7) to apply to the Hope Center.

125.    Title 5 of the AMC discusses the filing of complaints with or by the Anchorage Equal Rights Commission, as well as the investigative process of those complaints and fact finding procedures.

126.    The Commission or the Executive Director of the Commission may initiate investigations against an organization at any time. AMC § 5.50.060.

127.     According to AMC § 5.50.020(A), "[a]fter a complaint has been filed, staff shall convene a fact finding conference with the parties to define issues, receive and exchange information relevant to the complaint and response, if any, and negotiate a voluntary resolution of the complaint, if possible, through a pre-determination settlement agreement. Parties shall be permitted to be fully represented by legal counsel at the fact finding conference. Legal counsel shall be entitled to speak and present on behalf of the represented party at the fact finding conference. Legal counsel may not, however, cross-examine the other party and must submit any questions through staff."

128.     A "fact finding conference" is an initial meeting where evidence is produced and the complaint is discussed with the parties. AMC § 5.20.010.

129.     The AMC also provides that the Commission shall provide "[t]he procedures to be followed at the conference" at least 21 days prior to the fact finding conference, "[e]xhibits and documents received at a fact finding conference may be used as evidence in making a determination", "[s]tatements made by a party during a fact finding conference may be used as evidence in making a determination….", and that "[e]ach party may bring a reasonable number of witnesses." AMC §§ 5.50.020(B)(3), (C), (F), (G).

130.     If a matter is not settled between the parties, the Executive Director notifies the Commission, and the chair of the Commission then appoints a "hearing panel," which consists of three commissioners hand-picked by the chair. AMC §§ 5.70.20, 5.70.030.

131.     The hearing panel may conduct hearings or appoint a hearing examiner to conduct hearings. In conducting a hearing, the hearing panel or hearing examiner has full authority to rule on the admissibility of evidence and other procedural matters. AMC § 5.70.040.

132.    At the completion of a public hearing, the hearing panel may issue a final order in the case. AMC § 5.70.130.

133.    The Commission may obtain a court order for the enforcement of any of its orders by filing a complaint with the superior court in the Third Judicial District. AMC § 5.80.030(B).

134.    The Commission and/or its employees or representatives have the power to file a complaint, initiate an investigation, conduct discovery, conduct the hearing, choose those that preside over it, issue a ruling and enforce any penalty and punishment.

**The First Commission Complaint**

135.    On February 1, 2018, Doe filed a complaint ("First Complaint") with the Commission claiming that the Hope Center had discriminated against Doe on the basis of sex and gender identity under AMC § 5.20.050, which prohibits discrimination in places of public accommodation.

136.    The following day, the Commission forwarded the First Complaint to the Hope Center, along with a notice of a fact finding conference.

137.    On March 6, 2018, the Hope Center's counsel, Kevin Clarkson ("Clarkson"), responded to the First Complaint via letter, informing the Commission that (a) the Hope Center was not a place of public accommodation; (b) Doe was turned away initially because Doe was under the influence of alcohol and had been involved in a fight at Francis Shelter; (c) Doe was turned away the following day because Doe appeared at a time when the Hope Center was not accepting individuals; and (d) the Hope Center has a First Amendment right to religious liberty and association that permit it to operate exclusively so as to provide charitable shelter to abused and battered women ("March 6 Letter").

138.   Clarkson concluded the March 6 Letter by stating the Hope Center would not be attending the fact finding conference, and that should the Commission decide to proceed with the matter, the Hope Center intended to file a motion to dismiss.

139.   The information provided should have been sufficient for the Commission to dismiss the First Complaint or reach a determination that the complaint was not supported by substantial evidence.

140.   But instead, the Commission continued its "investigation" by serving mostly irrelevant and overbroad interrogatories to the Hope Center that contained close to 30 different subparts.

**Proposition 1**

141.   On March 14, 2018, the *Anchorage Daily News* published an article about Proposition 1, an Anchorage initiative to regulate restrooms, locker rooms, and other facilities based on the sex at birth of those seeking to access those facilities. ("March 14 Article").

142.   In that March 14 Article, the reporter referenced alleged comments made by Attorney Clarkson concerning the First Complaint against the Hope Center.

143.   Discussion of the First Complaint was relevant to the ongoing political debate in Anchorage about whether Proposition 1 should be passed.

144.   According to the March 14 Article, Clarkson said that "the person who filed the [First Complaint] was not kept out of the shelter because they were transgender. He said it was because the person was intoxicated and came to the shelter while it was closed. Even so, Clarkson said the Hope Center is a religious organization that would not allow a

'biological man' to be sheltered there. The city's other two emergency women's shelters, one of which is run by Catholic Social Services, do take in transgender women."

145.    On April 23, 2018, the Hope Center filed its motion to dismiss the First Complaint against it for lack of jurisdiction with the Commission, but to date the Commission has refused to rule on the motion.

146.    On April 26, 2018, the Commission "noted" receipt of the motion to dismiss, and made the first of several accusatory comments against the Hope Center and/or its counsel.

147.    For example, rather than dismiss or reach a determination that the complaint was not supported by substantial evidence, the Commission attached a "pre-determination settlement agreement, which [it believed would] adequately address [Hope Center's] perceived misconduct and the Commission's public policy concerns which arose as a result of [Hope Center's] or its attorney's actions."

148.    Based upon the Commission's statements to and interactions with the Hope Center during this investigation, it became clear that the Commission interpreted the Anchorage public accommodation law as requiring the Hope Center to admit biological men into its women's shelter and that the Commission considered the Hope Center guilty of committing "sex" or "gender identity" discrimination in violation of that law.

149.    On Friday, May 11, 2018, the Hope Center declined the Commission's pre-determination settlement proposal related to the First Complaint as it had violated no law.

**The Second Commission Complaint**

150.    Unable to find any wrongdoing by the Hope Center in the First Complaint but unwilling to dismiss that complaint, the Commission continued its effort to force the Hope Center to change its policies anyway.

151.    On Tuesday, May 15, 2018, Director Basler, filed a second complaint against the Hope Center. ("Second Complaint").

152.    Director Basler also filed this Second Complaint against Brena, Bell & Clarkson, P.C., the counsel of record for Hope Center at the time.

153.    In this Second Complaint, the Commission alleged that the Hope Center, through its alleged "spokesperson," Clarkson, "published, circulated, issued, displayed, posted, or mailed a written or printed communication, notice or advertisement, or caused to be circulated, issued or displayed, made, printed or published, a communication which states or implies that the use of Downtown Hope Center's real property and/or services or facilities will be refused to or denied to a person because of their sex and/or gender identity, in violation of Anchorage Municipal Code § 5.20.020(A)(7) and/or Anchorage Municipal Code § 5.20.050(A)(2)."

154.    The Commission contends in its Second Complaint that Clarkson has been identified as the source of statements published in various media which implied or stated that transgender individuals would not be allowed to be sheltered at the Hope Center.

155.    Contemporaneously with the filing of the Second Complaint, the Commission set a fact finding conference and sent a "Request for Essential Information."

156.    As a result of the potential conflict caused by the Commission's filing of the Second Complaint against the Hope Center's attorney, the Hope Center was forced to hire new counsel, Alliance Defending Freedom, the undersigned representing it in this litigation.

157.    On June 21, 2018, Alliance Defending Freedom ("ADF") entered an appearance in the Second Complaint, and informed the Commission that an ADF attorney would serve as the "contact person" for the Hope Center.

158.    But the Commission refused to correspond with ADF attorneys even though these attorneys had affiliated themselves with a local attorney who was also representing the Hope Center.

159.    On June 29, 2018, the Hope Center's new counsel sent a letter to the Commission ("June 29 Letter") informing the Commission that counsel had a conflict with the fact finding conference date chosen by the Commission and had several concerns related to the lack of constitutional procedures and protections pertaining to the fact finding conference itself.

160.    The June 29 letter also noted that Hope Center intended to supplement its interrogatory answers to include additional information on the jurisdictional issues.

161.    The June 29 Letter also informed the Commission that the "procedures to be followed at the conference" had not been sent to the parties, as required, and requested a copy of all relevant procedures referred to in the AMC.

162.    Next, to the extent the "procedures" mentioned in AMC § 5.50.020(B)(3) referred to AMC § 5.50.020 as a whole, the June 29 Letter stated the Hope Center's concerns about the lack of constitutional protections provided in the ordinance itself.

163.    Fact finding conferences at the Commission are evidentiary in nature, but as counsel pointed out in its June 29 Letter, it is unclear what rules govern the admission of evidence at those conferences and how those rules are applied.

164.    In its June 29 Letter, the Hope Center's counsel asked whether objections to evidence would be allowed, whether there was a different standard for "documents" submitted, what rules were applicable, and how objections to evidence or "documents" were preserved.

165.    In relation to AMC § 5.50.020(G), the Hope Center asked in its June 29 Letter whether counsel may object to questions asked or answers given, instruct a client not to answer, or even ask a client to clarify a response during the conference.

166.    The Hope Center also pointed out in its June 29 Letter that it had similar issues with the "reasonable number of witnesses" that a party may bring.

167.    And the Hope Center inquired whether the prohibition on cross examination of the "other party" extended to witnesses brought by the "other party."

168.    Due to unavailability of lead counsel and the fact it was unclear what the procedures were, what rules were applicable, how those rules were expected to be applied, and whether those procedures would comply with due process, the Hope Center requested a reset of the fact finding conference in its June 29 Letter.

169.    The Commission failed to answer any of the questions posed by the Hope Center's counsel in its June 29 Letter.

170.    Even though the Commission set the fact finding conference without inquiring about counsel's availability, the Commission contacted Hope Center's local attorney and proceeded to deny the request for continuation of the fact finding conference

and stated that the information requested in its Request for Essential Information was due days before the fact finding conference.

171.    On July 5, 2018, before the fact finding conference, the Hope Center's counsel sent a letter to the Commission, noted disappointment with the Commission's refusal to reschedule the conference, again requested clarity about the conference's procedures, and submitted responses to the Commission's Request for Essential Information.

172.    The same day, the Hope Center filed a motion for lack of jurisdiction, further illustrating that the Commission had no basis to hold a fact finding conference.

173.    In its Second Complaint, the Commission did not accuse the Hope Center of directly violating AMC § 5.20.020 or AMC § 5.20.050, but instead contends that oral statements made by Clarkson, its former counsel, subject it to this section.

174.    The Commission has not alleged that Clarkson or his firm is an "owner," "lessor," "manager," "brokerage service," "owner's association," or "person having the right to sell, lease, rent [or] advertise" the Hope Center.

175.    Instead, the Commission appears to be accusing Clarkson of being an "agent" of real property for the Hope Center.

176.    But Clarkson was the Hope Center's attorney—not an "agent" of real property.

177.    Clarkson's comments themselves are also not actionable under the law. In addition to being protected by the litigation privilege, the law requires a written statement, and Clarkson's comments to the media were done orally.

178.    In its motion for lack of jurisdiction, the Hope Center pointed out that not only had the Commission failed to properly plead a claim against the Hope Center for violation

of AMC § 5.20.020 and 5.20.050, but that homeless shelters were specifically excluded from that section as well as all of Title 5 of the AMC.

179.    Section 5.20.020(A) specifically incorporates the exemption for homeless shelters found at 5.25.030(A)(9).

180.    And because the Hope Center is a "shelter for the homeless" and all sections of an ordinance should be construed together so that all have meaning and no section conflicts with one another, the Commission should have dismissed the First Complaint and Second Complaint against the Hope Center on this basis alone.

181.    Along with the specific exclusion from the ordinance, the Hope Center is also not a place of public accommodation.

182.    The AMC limits its definition of public accommodation to a business or commercial enterprise that serves the general public for profit or some other form of financial benefit.

183.    The Hope Center's women's shelter is not a business or commercial enterprise, currently receives no government funds directly, but instead receives private donations from individuals, other non-profits, businesses, foundations, and churches.

184.    The Hope Center women's shelter operates exclusively on a charitable basis.

185.    The Hope Center women's shelter does not conduct commercial transactions or other forms of "for profit" activities, and it does not cater to, or offer goods or services to, "the general public."

186.    Despite the Hope Center women's shelter not meeting the definition of "public accommodation" and despite the Hope Center asking the Commission to address this point, the Commission pressed forward with the fact finding conference anyway.

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

**Fact Finding Conference**

187.     On July 9, 2018, local counsel for the Hope Center, as well as local counsel for Brena, Bell & Clarkson, appeared at the fact finding conference in the Second Complaint.

188.     As they previously told the Commission, Brena, Bell & Clarkson's local counsel came prepared with a court reporter to transcribe the fact finding conference.

189.     But the Commission informed counsel that transcription of the conference by the court reporter would not be allowed.

190.     Rather than address whether the Hope Center was a public accommodation or any of the facts or allegations involved in the Second Complaint, the Commission instead wrongly accused the Hope Center of not providing truthful answers to interrogatories in the First Complaint served two months earlier.

191.     The Commission also alluded to materials it had in its possession allegedly demonstrating inconsistencies with the Hope Center's discovery responses involving funding, but refused to show those materials to counsel and suggested it might at some later point.

192.     On July 13, 2018, the Hope Center's local counsel followed up with the Commission and again asked for the materials promised during the fact finding conference in the Second Complaint ("July 13 e-mail").

193.     But Hope Center's counsel received the following negative response from the Commission's investigator in return:

> In an effort to not distract what should be the immediate concerns of the parties regarding [settlement], we are not going to require [the Hope Center] to provide any supplemental information at this time, nor are we, at this time, going to be supplementing the information provided to the parties.

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

194.     In the same communication, the Commission also made derogatory comments about the Hope Center's prior counsel who had to withdraw from representation of the Hope Center due to the complaint filed by the Executive Director.

195.     The Commission's investigator continued his July 13 e-mail by stating that "[p]erhaps [the Hope Center's prior counsel] will be more forthcoming with providing [] information to [the Hope Center's new counsel] than he has been to the Commission…."

196.     After receiving the July 13 e-mail, the Hope Center received a proposed pre-determination settlement proposal from the Commission.

197.     Despite the Commission's targeting of the Hope Center and its counsel, the Hope Center proceeded in good faith to engage in settlement discussions.

198.     On August 3, 2018, in the midst of those settlement discussions, the Commission unexpectedly accused the Hope Center and its counsel of not being forthright with the Commission.

199.     Specifically, the Commission accused Hope Center's counsel of failing to supplement discovery responses, even though the Hope Center's counsel indicated its intent to supplement its responses earlier and the Commission told counsel that supplementation was not necessary. *See supra* ¶¶ 157, 185-90.

200.     The Commission sent an e-mail on that date stating in part as follows:

This notice is being sent to all of you because each of you has a professional responsibility to correct any false or misrepresented information that has previously been submitted to the Commission during its investigation of the above-referenced complaint. Although you may not have been representing the client at the time the statements were made to the Commission, as Respondent's current attorneys, each of you is ethically obligated to correct any omissions, false statements, and/or misrepresentations previously made to the Commission.

I have attached a copy of the previously submitted interrogatories. Respondent has already been allowed almost three months to make corrections to this information,

and the Commission's ability to fully consider Respondent's arguments will continue to be limited by Respondent's failure to timely amend and correct its earlier responses. The Commission will allow Respondent until **August 9, 2018**, to make appropriate corrections to the interrogatory responses before it takes any formal action in regards to what it views as Respondent's lack of candor about its receipt of taxpayer funds and the contractual obligations for the receipt of those funds.

201.    The Commission's allegations in its August 3, 2018 e-mail were false.

202.    The Commission had not been waiting for "almost three months" for the Hope Center to make "corrections" to its interrogatory answers.

203.    The Hope Center was first informed on July 9, 2018 during the fact finding conference in the Second Complaint that the Commission had a vague concern related to its discovery responses.

204.    Four days after that fact finding conference, the Commission told the Hope Center's counsel that it was not going to require the Hope Center to provide any supplemental information at that time, but instead wanted to focus on resolution.

205.    Despite the Commission's attacks, the Hope Center on August 9, 2018, amended its answers and objections to the Commission's interrogatories in the First Complaint—not to correct alleged deficiencies, but to further substantiate reasons for dismissal of the complaint and to demonstrate more plainly to the Commission that its original answers were indeed truthful.

206.    To date, the Commission has not ruled on the Hope Center's motions for lack of jurisdiction.

207.    Nor has the Commission issued any determination that the First Complaint or Second Complaint is or is not supported by substantial evidence.

208.    The First Complaint and Second Complaint are still in the "impartial investigation" phase.

**Anchorage is interpreting its law to stop the Hope Center from helping others**

209.    The Hope Center desires to continue its policy of allowing only biological females into its women's shelter.

210.    And due to the recent complaints filed against the Hope Center and publicity surrounding it and its desire to be upfront and honest with others, the Hope Center likewise desires to make its policies clear by posting them both at the women's shelter and online.

211.    But because of Anchorage's public accommodation laws and the Commission's hostile interpretation of them, the Hope Center faces only burdensome options.

212.    First, the Hope Center could comply with Anchorage's interpretation of these laws and seek to avoid investigation and punishment by allowing biological males to sleep in its shelter reserved solely for biological women, many of whom have been abused by men or escaped sex trafficking.

213.    But the Hope Center cannot take this first option because it not only places women at risk, it defies common sense, and likewise violates its religious beliefs.

214.    Women who use the shelter have informed Hope Center officials that they would not feel safe if they had to sleep and undress next to men.

215.    The Hope Center cannot pursue its religious mission or teach its religious beliefs about loving those in need and about the difference between men and women when Anchorage forces the Hope Center to put homeless women at risk and to deny the distinction between men and women.

216.     Second, the Hope Center could violate Anchorage's interpretation of these laws by posting statements on the Hope Center grounds and on its website explaining the Hope Center's beliefs about sex and gender identity and explaining its denial of biological males into its women's shelter.

217.     The Hope Center could also violate Anchorage's interpretation of these laws by having its attorneys talk about the Hope Center's policies, its beliefs about sex and gender identity, and the complaints filed against the Hope Center.

218.     In fact, if not for Anchorage's interpretation of its laws, the Hope Center would direct its current lawyers to speak about the Hope Center's policies about sex and gender identity, its beliefs about sex and gender identity, and the complaints filed against the Hope Center.

219.     And if not for Anchorage's interpretation of its laws, the Hope Center's attorneys would speak about these subjects in press releases, media interviews, and on their website.

220.     But the Hope Center and its attorneys will not take this second option because they do not want to violate Anchorage's laws and suffer its penalties.

221.     Third, the Hope Center could refrain from posting statements explaining its beliefs on sex and gender identity, the complaints filed against the Hope Center, and its policies on sex and gender identity, and the Hope Center could also have its attorneys refrain from public discussion of these topics as well.

222.     The Hope Center has temporarily taken this third option to avoid violating the Anchorage laws.

223.     Specifically, the Hope Center has refrained from posting a statement on its grounds where women are admitted into its shelter, as well as on its website under the tab

"About the Women's Shelter" located at   https://www.downtownhopecenter.org/
womensshelter.

224.    The statement the Hope Center wants to post is attached as Exhibit 3.

225.    Likewise, the Hope Center's attorneys have been chilled from publicly discussing
the Hope Center's religious beliefs and policies on its website (www.adflegal.org), in press
releases, and in media interviews even though it typically discusses those topics for other clients
through these mediums.

226.    The Hope Center will not post its desired statement on its grounds or on its
website, and the Hope Center's attorneys have been chilled in communicating about the Hope
Center in its typical fashion for fear of violating Anchorage's laws.

227.    If not for Anchorage's laws, the Hope Center would immediately post the
statement attached as Exhibit 3 both on its grounds where the women are admitted into its shelter
as well as on the "About the Women's Shelter" portion of its website.

228.    This third option—not posting—also violates the Hope Center's religious beliefs
because the Hope Center is religiously motivated and obligated to follow God's calling to foster
a safe environment for those women seeking refuge from the horrors they have experienced.

229.    Left with no option that does not violate its faith or the law, the Hope Center has
no choice but to challenge the Anchorage laws for violating the United States and Alaska
Constitutions.

## ALLEGATIONS OF LAW

230.    At all times relevant to this Complaint, each and all of the acts alleged here are
attributable to Defendants, who acted under color of a statute, regulation, custom, ordinance, or
usage of the Municipality of Anchorage.

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

231.    The Hope Center currently suffers imminent and irreparable harm because of Defendants' actions that violate the Hope Center's constitutional rights.

232.    The Hope Center has no adequate or speedy remedy at law for the loss of its constitutional rights.

233.    Unless Defendants' conduct is enjoined, the Hope Center will continue to suffer irreparable injury.

## FIRST CAUSE OF ACTION

### First Amendment: Free Exercise of Religion

234.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

235.    The First Amendment to the United States Constitution protects the Hope Center's rights to operate, publish, speak, and not speak, in accordance with its religious beliefs.

236.    The Hope Center has sincerely held religious beliefs that motivate and require it to operate its ministry in accordance with biblical moral teachings and to teach and explain those beliefs to the public and those the Hope Center serves.

237.    The Hope Center would violate its religious beliefs if it were forced to allow biological males admittance into its women's only shelter and stopped from informing others about its religious beliefs.

238.    AMC § 5.20.050 and AMC § 5.20.020 are not neutral or generally applicable as applied because they are based on hostility towards the Hope Center's disfavored religious beliefs and they target the Hope Center's disfavored religious beliefs for punishment.

239.    The Commission is pursuing complaints against the Hope Center without any substantial evidence.

240.     The Commission has made statements during the course of its investigation indicating its disdain for the Hope Center and/or its attorneys.

241.     The Commission is engaging in intrusive and unnecessary discovery in the First Complaint.

242.     Director Basler, through the Commission, purposefully brought a frivolous complaint against the Hope Center and its prior counsel without any basis in the law, resulting in the need for it to obtain new representation.

243.     The First Amendment protects the Hope Center's rights to believe and profess the religious doctrines of its choice.

244.     The First Amendment prohibits the government from interfering with this right by punishing the profession of a religious belief or imposing special disabilities on the basis of stating disfavored religious views.

245.     AMC § 5.20.050 and AMC § 5.20.020 punish the Hope Center's profession of its religious beliefs.

246.     Application of AMC § 5.20.050 and AMC § 5.20.020 are being threatened against the Hope Center to coerce it into changing its policies based on its own religious beliefs.

247.     AMC § 5.20.050 and AMC § 5.20.020, therefore, impose special disabilities on the Hope Center due exclusively to its profession of disfavored religious beliefs.

248.     AMC § 5.20.050 and AMC § 5.20.020 directly and substantially interfere with the Hope Center's power to order its own affairs, including on matters of faith, doctrine, and operation.

249.     AMC § 5.20.050 and AMC § 5.20.020 are also not neutral or generally applicable because they contain categorical exemptions.

250.     AMC § 5.20.050 and AMC § 5.20.020 are not neutral or generally applicable because they are enforced through a system of individualized assessments.

251.     For example, AMC § 5.20.050 contains the undefined, vague, and overbroad terms "unwelcome," "not solicited," "objectionable," and "unacceptable" to describe what the AMC prohibits. Anchorage officials must determine—without any guidance—whether any of these prohibitions apply in a given case based on their own subjective determinations.

252.     AMC § 5.20.050 and AMC § 5.20.020 also violate Plaintiff's free exercise rights under the hybrid rights doctrine because they implicate free exercise rights in conjunction with other constitutional protections, like the rights to free speech, expressive association, due process and equal protection.

253.     AMC § 5.20.050 and AMC § 5.20.020 burden the Hope Center's sincerely held religious beliefs by banning, deterring, and preventing its religiously motivated speech, including the statement in Exhibit 3.

254.     AMC § 5.20.050 and AMC § 5.20.020 burden the Hope Center's sincerely held religious beliefs by preventing it from operating in accordance with its religious beliefs.

255.     Anchorage laws effectively prevent the Hope Center from speaking its religiously-desired messages, from not speaking in ways required by its faith, and from adhering to key aspects of its faith.

256.     AMC § 5.20.050 and AMC § 5.20.020 do not serve any compelling, significant or legitimate, or even valid interests in a narrowly tailored way.

257.     Accordingly, as applied to the Hope Center, AMC § 5.20.050 and AMC § 5.20.020 violate the First Amendment right to free exercise.

## SECOND CAUSE OF ACTION

### First Amendment: Freedom of Speech

258.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

259.    The First Amendment Free Speech Clause protects the Hope Center's rights to speak, to publish speech, to be free from content and viewpoint discrimination, to be free from unconstitutional conditions, to be free from vague laws allowing unbridled discretion, to be free from overbroad laws, to not speak, and to not publish speech.

260.    If not for Anchorage's interpretation of AMC § 5.20.050(A)(2) and AMC § 5.20.020(A)(7) as shown in the Second Complaint, the Hope Center and its agents, including its attorneys, would immediately engage in protected speech, including but not limited to, publishing and teaching its desired messages as set forth in Exhibit 3.

261.    Instead, the Hope Center is not only unable to publish or display a portion of its admittance policy, it likewise cannot discuss the Hope Center's religious beliefs concerning sex and gender identity.

262.    The Hope Center has not and will not engage in certain protected speech to avoid violating Anchorage's interpretation of AMC 5.20.050(A)(2) and AMC § 5.20.020(A)(7) and to avoid incurring the penalties for violating Anchorage's interpretation of that law.

263.    The Hope Center is currently suffering ongoing harm because of Anchorage's interpretation of AMC § 5.20.050(A)(2) and AMC § 5.20.020(A)(7).

264.    Because Anchorage's interpretation of AMC § 5.20.050(A)(2) and AMC § 5.20.020(A)(7) infringes rights under the Free Speech Clause, AMC § 5.20.050(A)(2) and

AMC § 5.20.020(A)(7) and Anchorage's enforcement of these provisions chill, deter, and restrict the Hope Center.

265. Further, vague and overbroad language included in the AMC allows unbridled discretion.

266. AMC § 5.20.050(A)(2)(b) makes it "unlawful" for the owner, agent, or employee of a public accommodation to imply that a person's "patronage or presence" belonging to a particular sex or gender identity would be "unwelcome, not desired, not solicited, objectionable or unacceptable."

267. AMC § 5.20.050(A)(2)(b) uses undefined and overbroad terms and phrases such as "implies that," "unwelcome," "not desired," "not solicited," "objectionable," and "unacceptable" to describe the speech that is prohibited.

268. AMC § 5.20.050(A)(2)(b) is vague, facially and as applied, because it outlaws communications stating that any accommodations, facilities, or services will be refused or restricted because of gender identity.

269. AMC § 5.20.050(A)(2)(b) is overbroad because it outlaws publishing, circulating, issuing, displaying, posting or mailing a written or printed communication, notice of advertisement "which states or implies that . . . [t]he patronage or presence of a person belonging to a particular race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability is unwelcome, not desired, not solicited, objectionable or unacceptable."

270. And the AMC definition of "gender identity" in AMC § 5.20.010 is facially unconstitutional under the First Amendment's Free Speech Clause because its vague terms grant

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

unbridled discretion to enforcement officials to ban speech the government opposes and to allow speech the government supports.

271.     AMC § 5.20.010 uses undefined and overbroad terms and phrases such as "evidence of medical history," "consistent," "uniform," and "improper purpose" to define "gender identity."

272.     Those terms and phrases are not defined by the AMC, nor does that ordinance language provide guidelines to govern the decisions of Defendants in applying and enforcing these vague and overbroad terms.

273.     This permits Defendants to use unbounded discretion to punish disfavored speech on sex, gender identity, and other topics of public concern.

274.     This unbridled discretion also exacerbates the issue of viewpoint discrimination.

275.     Because Defendants' interpretation of AMC § 5.20.050(A)(2) and AMC § 5.20.020(A)(7) violates free-speech principles for all of the reasons stated above, they must further a compelling interest in a narrowly tailored way.

276.     Prohibiting the Hope Center from displaying or publishing its religiously motivated policy explaining its religious beliefs does not further any legitimate, rational, substantial, or compelling interest.

277.     Punishing the Hope Center's speech also does not serve any legitimate, rational, substantial, or compelling government interest in a narrowly tailored way.

278.     Defendants have alternative, less restrictive means to achieve any legitimate interest they may possess rather than forcing the Hope Center to abandon its free-speech rights.

279.     Moreover, punishing speech which states or implies the patronage or presence of a person belonging to a protected class is "unwelcome, not desired, not solicited, objectionable

or unacceptable" does not further any legitimate, rational, substantial, or compelling interest, and certainly does not further any such interests in a narrowly tailored way.

280.    Defendants have alternative, less restrictive means to achieve any legitimate interest they may possess rather than banning all speech which states or implies the patronage or presence of a person belonging to a protected class is "unwelcome, not desired, not solicited, objectionable or unacceptable" because of a protected classification.

281.    Accordingly, as applied to the Hope Center and any of its agents, AMC § 5.20.050(A)(1)-(3) and AMC § 5.20.020(A)(7) violates the First Amendment right to free speech.

282.    Accordingly, facially, AMC § 5.20.010's definition of gender identity and AMC § 5.20.050(A)(2)(b) violate the First Amendment right to free speech.

## THIRD CAUSE OF ACTION

### Fourteenth Amendment: Procedural Due Process

283.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

284.    The Due Process Clause of the Fourteenth Amendment guarantees persons the right to due process of law, which includes the right to be free from vague guidelines granting officials unbridled discretion.

285.    The Hope Center's Fourteenth Amendment right to due process is violated in both the vague language the ordinance uses as well as the lack of procedural safeguards included in the investigatory process.

286.    First, AMC § 5.20.010 uses undefined and overbroad terms and phrases such as "evidence of medical history," "consistent," "uniform," and "improper purpose" to define "gender identity."

287.    AMC § 5.20.050(A)(2)(b) also uses undefined and overbroad terms and phrases such as "implies that," "unwelcome," "not desired," "not solicited," "objectionable," and "unacceptable" to describe the speech that is prohibited.

288.    Second, although AMC § 5.20.020(A)(7) does not apply to "shelters for the homeless," Defendants have interpreted such language to apply to the Hope Center.

289.    AMC § 5.20.020(A)(7) is therefore vague as applied to the Hope Center and does not provide it fair notice.

290.    And even though AMC § 5.20.020(A)(7) is not applicable to attorneys, the Commission is applying it as such.

291.    Third, according to AMC § 5.50.020(A), "[a]fter a complaint has been filed, staff shall convene a fact finding conference with the parties to define issues, receive and exchange information relevant to the complaint and response, if any, and negotiate a voluntary resolution of the complaint, if possible, through a pre-determination settlement agreement. Parties shall be permitted to be fully represented by legal counsel at the fact finding conference. Legal counsel shall be entitled to speak and present on behalf of the represented party at the fact finding conference. Legal counsel may not, however, cross-examine the other party and must submit any questions through staff."

292.    The AMC also provides that the Commission shall provide "[t]he procedures to be followed at the conference" at least 21 days prior to the fact finding conference, "[e]xhibits and documents received at a fact finding conference may be used as evidence in

making a determination", "[s]tatements made by a party during a fact finding conference may be used as evidence in making a determination….", and that "[e]ach party may bring a reasonable number of witnesses." AMC §§ 5.50.020(B)(3), (C), (F), (G).

293.     These provisions use vague and undefined terms and guidelines granting officials unbridled discretion.

294.     Lastly, the Hope Center is entitled to a neutral arbiter, but the powers provided to the Commission in AMC Title 5 do not afford it that right.

295.     The mayor has the power to appoint members to the Commission, and the Commission has the authority to hire an executive director, subject to the approval of the mayor.

296.     The Commission then and/or its employees or representatives have the power to file a complaint, initiate an investigation, conduct discovery, conduct the hearing, choose those that preside over it, issue a ruling, and enforce any penalty and punishment.

297.     As such, Title 5 is devoid of procedural safeguards to protect any respondent who has had a claim filed against it. The broad powers given to the Commission violate the concepts of legal fairness, objectivity and due process.

298.     In addition, the Commission's actions have also interfered with the Hope Center's representation by counsel.

299.     AMC §§ 5.20.010, 5.20.050, and 5.50.020 do not serve any compelling, significant or legitimate, or even valid interest in a narrowly tailored way.

300.     Accordingly, as applied to the Hope Center, AMC §§ 5.20.010, 5.20.050, and 5.50.020 violate the Fourteenth Amendment right to due process under the laws.

301.    Accordingly, facially, AMC § 5.20.010's definition of gender identity, § 5.20.050(A)(2)(b), and the lack of procedural safeguards contained in Title 5 violate the Fourteenth Amendment right to due process under the laws.

## FOURTH CAUSE OF ACTION

### First Amendment: Freedom of Expressive Association

302.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

303.    The First Amendment protects the right of people to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends.

304.    The First Amendment bars the government from compelling people to associate with others in an association expressing messages.

305.    The First Amendment also prohibits the government from banning people from associating with others in an association expressing messages.

306.    The Hope Center is an expressive association because people with likeminded beliefs, including those on staff and volunteers at its shelter, are joining together to teach and serve the homeless in Anchorage and express their religious beliefs about the differences between men and women.

307.    The volunteers and staff at the Hope Center's shelter advocate the position that women deserve dignity and respect and a safe space. Forcing the Hope Center's shelter to accept men would undermine its ability to advocate that position and cause it to reconsider its operations going forward.

308.    AMC § 5.20.050(A)(2) and AMC § 5.20.020(A)(7) harm the Hope Center's ability to promote its beliefs by requiring it to either decline to associate with others that help

promote its religious messages or to associate with individuals and events that will require it to speak messages that completely contradict its desired message.

309.     The Hope Center likewise engages in expressive association when Hope Center officials partner with each other and decide to partner with homeless women, teaching them certain biblical values and lessons.

310.     In offering shelter and engaging in Bible studies with those who seek shelter, the Hope Center expressively associates with those homeless women for the purpose of communicating desirable messages to those individuals.

311.     One of the reasons that the Hope Center associates with homeless women is to express messages consistent with its religious beliefs about God's ability to restore, renew, and transform.

312.     The Hope Center uses real-life stories of care that it helped facilitate to promote their religious view of God's design.

313.     The Hope Center uses these real-life stories in various ways, such as in speaking engagements, to encourage others to adopt their religious ideals regarding God's design.

314.     When the Hope Center assists a homeless woman get on her feet, they associate with that individual, who themselves become an ongoing, living example that communicates to friends, co-workers, and others regarding the Hope Center's views about God's design.

315.     It is common for people to learn about the homeless shelter services that the Hope Center provides from women who have used the Hope Center's services.

316.     When people learn that the Hope Center assisted a homeless female, people believe that the services provided were consistent with the Hope Center's religious beliefs.

317.    Defendants have indicated that, under AMC § 5.20.050 and AMC § 5.20.020(A)(7), the Hope Center must expressively associate with biological males in its women's only shelter and allow them access to homeless women who have been abused and battered.

318.    By compelling the Hope Center to expressively associate with biological males in its women's only shelter, Defendants force the Hope Center to expressively associate in a way that communicates messages to women under its care and the community that are contrary to the Hope Center's desired messages, including messages that contradict the Hope Center's religious beliefs.

319.    Thus, Defendants' interpretation of AMC § 5.20.050 and AMC § 5.20.020(A)(7) infringes on the Hope Center's right to expressively associate and to be free from compelled expressive association.

320.    Because AMC § 5.20.050 and AMC § 5.20.020(A)(7) infringes on the Hope Center's expressive association rights, it must further a compelling interest in a narrowly tailored way.

321.    As applied to the Hope Center, AMC § 5.20.050 and AMC § 5.20.020(A)(7) does not further any legitimate, rational, substantial, or compelling interest by forcing the Hope Center to expressively associate with biological males who desire to sleep under the same roof as homeless women, thereby conveying messages to the women under its care and the community that violates the Hope Center's religious beliefs.

322.    Moreover, compelling such expressive association does not serve any legitimate, rational, substantial, or compelling interest in a narrowly tailored way.

323.    Defendants have alternative, less restrictive means to achieve any legitimate interest they may possess rather than forcing the Hope Center to abandon its freedom of expressive association.

324.    Accordingly, as applied to the Hope Center, AMC § 5.20.050 and AMC § 5.20(A)(7) violate the Hope Center's right to expressive association protected by the Free Speech Clause of the First Amendment.

## FIFTH CAUSE OF ACTION

## <u>First Amendment: Establishment Clause</u>

325.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

326.    The Establishment Clause of the First Amendment requires the government to act with a secular purpose and to neither promote nor inhibit religion.

327.    The government may not interfere with the power of a religious organization to order its own affairs, including on matters of faith, doctrine, and operation.

328.    Defendants' continued investigation of the Hope Center lacks any secular purpose. Instead, Defendants have targeted and singled out religious speech and belief for exclusion.

329.    Defendants' investigation and threatened enforcement of its public accommodation laws violate the Establishment Clause by singling out religious speech and belief for hostility.

330.    Defendants' investigation and threatened enforcement singles out and excludes the Hope Center based on a disfavored religious view and sends a message that a religious

person, such as the Hope Center, is a second-class citizen, outsider, and not a full member of the community.

331.    No compelling state interest exists to justify the actions of Defendants.

332.    Because Defendants' actions violate the Hope Center's rights under the Establishment Clause, they must further a compelling government interest in a narrowly tailored way.

333.    Targeting the Hope Center for exclusion based on its statement of a disfavored religious view does not further any legitimate, rational, substantial, or compelling government interest; nor does it serve any legitimate government interest in a narrowly tailored way.

334.    Accordingly, as applied to the Hope Center, Defendants' actions violate the Establishment Clause of the First Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

## SIXTH CAUSE OF ACTION

### Fourteenth Amendment: Equal Protection

335.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

336.    Under the Equal Protection Clause, the government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens the exercise of a fundamental right.

337.    The Hope Center has a fundamental right to free speech and free exercise.

338.    The Hope Center is similarly situated to other similarly situated facilities in Anchorage that provide housing.

339.     Defendants treat the Hope Center's exercise of its religious beliefs differently than those similarly situated facilities.

340.     Under the AMC's housing section, educational facilities may establish same-sex dormitories; however, Anchorage has interpreted its public accommodation laws to forbid the Hope Center from doing the same. *See* AMC § 5.25.030(A)(8).

341.     Section 5.25.030(A)(9) of the AMC's housing section also states that the chapter shall not apply to homeless shelter**s.**

342.     Thus, Defendants treat the Hope Center differently from similarly situated parties in a manner that infringes on the Hope Center's freedom of religion, speech, and association.

343.     When the enforcement of laws, like the AMC, infringes on a fundamental right, courts presume discriminatory intent.

344.     In this case, the presumption of discriminatory intent is also borne out in Defendants' targeting of the Hope Center based on its religious beliefs.

345.     Defendants do not serve any legitimate, rational, substantial, or compelling interest in treating the Hope Center differently than similarly situated agencies based solely on Hope Center's exercise of its fundamental rights.

346.     Defendants have many alternative, less restrictive mechanisms available to serve any legitimate interests they possess.

347.     Accordingly, as applied to the Hope Center, Defendants' actions violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as incorporated and applied to the States through the Fourteenth Amendment.

## SEVENTH CAUSE OF ACTION

### Alaska Constitution Article 1 § 4: Freedom of Religion

348. The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

349. Article 1, § 4 of the Alaska Constitution provides that "[n]o law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof."

350. Article 1, § 4 of the Alaska Constitution has been interpreted more broadly than its federal counterparts.

351. The government may not interfere with the power of a religious organization to order its own affairs, including on matters of faith, doctrine, and operation.

352. Defendants' actions and interpretation of AMC § 5.20.050 and AMC § 5.20.020 substantially burden the Hope Centers' religious exercise by using their investigation and threats of enforcement of public accommodation laws to surrender their religious beliefs and expression in order to provide shelter for the homeless community.

353. Further, Defendants' continued investigation of the Hope Center lacks any secular purpose. Instead, Defendants have targeted and singled out religious speech and belief for exclusion.

354. Defendants' investigation and threatened enforcement of its public accommodation laws violate Article 1, § 4 of the Alaska Constitution by singling out religious speech and belief for hostility.

355. Defendants' investigation and threatened enforcement singles out and excludes the Hope Center based on a disfavored religious view and sends a message that a religious

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

person, such as the Hope Center, is a second-class citizen, outsider, and not a full member of the community.

356.    Because Defendants' actions violate Article 1, § 4 of the Alaska Constitution, they must further a compelling government interest in a narrowly tailored way.

357.    The exercise of governmental authority which threatens to substantially burden the Hope Center's rights under Article 1, § 4 of the Alaska Constitution is imminent.

358.    Accordingly, as applied to the Hope Center, AMC § 5.20.050 and AMC § 5.20.020 violate Article 1, § 4 of the Alaska Constitution.

## EIGHTH CAUSE OF ACTION

### Alaska Constitution Article 1 § 1: Equal Protection

359.    The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

360.    Article 1, § 1 of the Alaska Constitution provides in part that "all persons are equal and entitled to equal rights, opportunities, and protection under the law…."

361.    The equal protection clause of the Alaska Constitution has been interpreted more broadly then the federal equal protection clause.

362.    The government may not treat someone disparately as compared to similarly situated persons when such disparate treatment burdens the exercise of a fundamental right.

363.    The Hope Center has a fundamental right to free speech and free exercise.

364.    The Hope Center is similarly situated to other similarly situated facilities in Anchorage that provide housing.

365.    Defendants treat the Hope Center's exercise of its religious beliefs differently than those similarly situated facilities.

49

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

366.     Under the AMC's housing section, educational facilities may establish same-sex dormitories; however, Anchorage has interpreted its public accommodation laws to forbid the Hope Center from doing the same. AMC § 5.25.030(A)(8).

367.     Section 5.25.030(A)(9) of the AMC's housing section also states that the chapter shall not apply to homeless shelter**s.**

368.     Thus, Defendants treat the Hope Center differently from similarly situated parties in a manner that infringes on the Hope Center's freedom of religion, speech, and association.

369.     When the enforcement of laws, like the AMC, infringes on a fundamental right, courts presume discriminatory intent.

370.     In this case, the presumption of discriminatory intent is also borne out in Defendants' targeting of the Hope Center based on its religious beliefs.

371.     Defendants do not serve any legitimate, rational, substantial, or compelling interest in treating the Hope Center differently than similarly situated agencies based solely on Hope Center's exercise of its fundamental rights.

372.     Defendants have many alternative, less restrictive mechanisms available to serve any legitimate interests they possess.

373.     Accordingly, as applied to the Hope Center, Defendants' actions violate the Equal Protection Clause of the Alaska Constitution.

## NINTH CAUSE OF ACTION

## Alaska Constitution Article 1 § 22: Right of Privacy

374.     The Hope Center repeats and realleges each allegation contained in paragraphs 1-233 of this Complaint.

375. Article 1, § 22 of the Alaska Constitution provides in part that "[t]he right of the people to privacy is recognized and shall not be infringed."

376. Women who stay at the Hope Center sometimes change at the shelter or are in various states of undress when preparing to sleep for the night. There are no biological males allowed at the women's shelter.

377. Homeless women do not expect, nor should they be forced, to change, sleep alongside, and interact with men in intimate settings. And this is particularly true considering that several of the women present at the shelter may have been beaten, raped, and sexually assaulted by men.

378. The Hope Center's interest in protecting women at its shelter conflicts with the Commission's desire to force those women to change, sleep alongside, and interact with men in intimate settings.

379. Because Defendants' actions violate Article 1, § 22 of the Alaska Constitution, they must further a compelling government interest in a narrowly tailored way.

380. The exercise of governmental authority which threatens to substantially burden the Hope Center's rights under Article 1, § 22 of the Alaska Constitution is imminent.

## PRAYER FOR RELIEF

The Hope Center respectfully requests that this Court enter judgment against Defendants and provide the Hope Center with the following relief:

(A) A temporary restraining order, preliminary injunction, and permanent injunction to stop Anchorage and any person acting in concert with it from enforcing AMC Title 5 as-applied to the constitutionally protected activities of the Hope Center and its agents, including its

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

right to post its desired policies, and to open its women's homeless shelter to biological women only;

(B)     A temporary restraining order, preliminary injunction, and permanent injunction to stop Anchorage and any person acting in concert with it from enforcing AMC § 5.20.050(A)(2)(b) or AMC § 5.20.010's definition of gender identity facially or as-applied to the constitutionally protected activities of the Hope Center and its agents, including its right to post its desired policies, and to open its women's homeless shelter to biological women only;

(C)     A declaration that AMC Title 5 violates the United States Constitution's Free Exercise of Religion, Freedom of Speech, Establishment, Due Process, and Equal Protection Clauses and Sections 1, 4, and 22 of the Alaska Constitution as-applied to the constitutionally protected activities of the Hope Center and its agents, including its right to post its desired policies, and to open its women's homeless shelter to biological women only;

(D)     A declaration that AMC § 5.20.050(A)(2)(b) and AMC § 5.20.010's definition of gender identity facially violate the United States Constitution's Freedom of Speech and Due Process Clauses and the Alaska Constitution's Free Speech Clause;

(E)     That this Court adjudge, decree, and declare the rights and other legal relations of the parties to the subject matter in controversy here so that these declarations shall have the force and effect of a final judgment;

(F)     That this Court award nominal damages for the violation of the Hope Center's constitutional and statutory rights;

(G)     That this Court retain jurisdiction of this matter for the purpose of enforcing its orders and that it adjudge, decree, and declare the rights and other legal relations of the parties to

*The Downtown Soup Kitchen v. Anchorage Equal Rights Commission*

the subject matter here in controversy so that these declarations shall have the force and effect of final judgment;

(H)    That this Court award the Hope Center costs and expenses of this action, including reasonable attorneys' fees, in accordance with 42 U.S.C. § 1988;  and

(I)    That this Court grant any other relief that it deems equitable and just in the circumstances.

Respectfully submitted this 15th day of August, 2018.

By: s/ David A. Cortman

David A. Cortman, AZ Bar No. 029490*
Jonathan A. Scruggs, AZ Bar No. 030505*
Ryan J. Tucker, AZ Bar No. 034382*
Katherine L. Anderson, AZ Bar No. 033104*
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 (Fax)
dcortman@adflegal.org
jscruggs@adflegal.org
rtucker@adflegal.org
kanderson@adflegal.org

Sonja Redmond, AK Bar No. 0605022
LAW OFFICE OF SONJA REDMOND
35865 Sunset Park St.
Soldotna, Alaska 99669
(907) 262-7846
(907) 262-7872 (Fax)
* pro hac vice admission forthcoming        sredmond@greatlandjustice.com

*Attorneys for Plaintiff*

**VERIFICATION OF COMPLAINT**

I, Sherrie Laurie, a citizen of the United States and a resident of the State of Alaska, hereby declare under penalty of perjury that I have read the foregoing Verified Complaint and the factual allegations contained therein, and the facts as alleged are true and correct.

Executed this 14 day of August, 2018, in Anchorage, Alaska.

_____

*Sherrie Laurie*