## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

THE DOWNTOWN SOUP KITCHEN
d/b/a DOWNTOWN HOPE
CENTER,

        Plaintiff,

    v.

MUNICIPALITY OF ANCHORAGE,
ANCHORAGE EQUAL RIGHTS
COMMISSION, and PAMELA
BASLER, Individually and in her
Official Capacity as the Executive
Director of the Anchorage Equal
Rights Commission,

        Defendants.

Case No. 3:18-cv-00190-SLG

## ORDER RE PENDING MOTIONS

Before the Court are four motions. First, Plaintiff The Downtown Soup

Kitchen ("Hope Center") filed a Motion for Preliminary Injunction at Docket 29.

Defendants Municipality of Anchorage, Anchorage Equal Rights Commission, and

Pamela Basler (collectively, "Anchorage") responded in opposition at Docket 52,

and Hope Center replied at Docket 63. Second, Anchorage filed a Motion for

Federal Abstention at Docket 43. Hope Center responded in opposition at Docket

56, and Anchorage replied at Docket 61. Third, Anchorage filed a Motion to Stay

Proceedings Pending Resolution of Defendants' Motion for Abstention at Docket

44. Hope Center responded in opposition at Docket 55, and Anchorage replied at

Docket 60. Fourth, Hope Center filed a Motion to Supplement or for Judicial Notice at Docket 79. Anchorage responded in opposition at Docket 85. On January 11, 2019, the parties presented oral argument on the first three motions. Oral argument on the fourth motion was not requested and was not necessary to the Court's determination.

## BACKGROUND

### Hope Center

Plaintiff Hope Center is a faith-based, non-profit organization that offers free food, showers, Christian ministry, and other services to homeless men and women in the downtown Anchorage area, as well as overnight shelter to homeless women.[1] Most of the women that Hope Center shelters have escaped from sex trafficking or been abused or battered, primarily at the hands of men.[2] Hope Center can accommodate up to 50 women overnight,[3] all of whom sleep on the floor in one large room, where they may change clothes or be in various states of undress.[4] Because of its religious beliefs and its limited space, Hope Center accepts only persons who were determined to be female at birth into its overnight

---

[1] Docket 1 (Compl.) at 7 ¶ 36, 8 ¶¶ 51–52, 9 ¶ 53, 10 ¶¶ 68–69.

[2] *Id.* at 8 ¶¶ 47–48.

[3] *Id.* ¶ 46.

[4] *Id.* at 12 ¶ 80.

shelter.[5]  Persons who were determined to be female at birth and who self-identify

as men are permitted to access the shelter.[6]

Hope Center maintains that its religious beliefs include that a person's sex

is an immutable God-given gift, and that it is wrong for a person to deny his or her

God-given sex.[7]  It contends that it would be against Hope Center's religious beliefs

---

[5] *Id.* at 8 ¶ 48.

The Court adopts the following definitions from the Third Circuit:

> "Sex" is defined as the "anatomical and physiological processes that lead to or denote male or female."  Typically, sex is determined at birth based on the appearance of external genitalia.

> "Gender" is a "broader societal construct" that encompasses how a "society defines what male or female is within a certain cultural context."  A person's gender identity is their subjective, deep-core sense of self as being a particular gender. . . . "[C]isgender" refers to a person who identifies with the sex that person was determined to have at birth.  The term "transgender" refers to a person whose gender identity does not align with the sex that person was determined to have at birth.  A transgender boy [or man] is therefore a person who has a lasting, persistent male gender identity, though that person's sex was determined to be female at birth. A transgender girl [or woman] is a person who has a lasting, persistent female gender identity though that person's sex was determined to be male at birth.

*Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018), *cert. denied sub nom. Doe v. Boyertown Area Sch. Dist.*, 139 S. Ct. 2636 (2019) (citations omitted).

[6] *Id.* at 11 ¶¶ 73–74.

[7] *Id.* at 9 ¶ 56.

to allow persons who were determined to be male at birth to disrobe and sleep in its shelter next to persons who were determined to be female at birth.[8]

Hope Center requires overnight guests to be persons who were determined to be female at birth; to be at least 18 years old; to demonstrate no dangerous behavior; to be clean and sober; to be exposed to religious activities; to be able to meet their personal needs without assistance; and to respect shelter guidelines, including prohibitions against smoking, fighting, foul language, and wandering about the property.[9] On Saturdays, when the shelter is staffed by volunteers, no one is allowed into the building to participate in the day shelter unless she stayed in the shelter the Friday night before and thus has gone through a bag check.[10] Saturday check-in time for new guests is at 5:45 p.m.[11]

Hope Center would like to post, publish, or circulate its admittance policy or portions of it,[12] but it has refrained from doing so for fear of violating the Anchorage Municipal Code ("AMC").[13] Similarly, Hope Center would like its attorneys to be

---

[8] *Id.* ¶ 60.

[9] *Id.* at 11 ¶¶ 72, 75.

[10] *Id.* at 12 ¶¶ 82–83.

[11] *Id.* ¶ 85.

[12] *Id.* at 10-11 ¶ 71, 30 ¶ 210.

[13] *Id.* at 31 ¶¶ 216–20.

able to speak and write about its policies[14] but fears that having them do so would violate the AMC.[15]

## Anchorage Equal Rights Commission

Defendant Anchorage Equal Rights Commission ("AERC") is an administrative agency within the Municipality of Anchorage.[16]  In support of the Municipality's policy of guaranteeing "fair and equal treatment under law to all people of the municipality,"[17] AERC investigates complaints of discrimination "based upon race, color, sex, sexual orientation, gender identity, religion, national origin, marital status, age, or physical or mental disability."[18]  It also is empowered to initiate a general investigation on its own motion to determine whether an individual or organization is engaging in such discrimination.[19]  AERC is authorized

---

[14] *Id.* ¶¶ 218–19.

[15] *Id.* ¶¶ 217, 220.

[16] AMC § 5.10.020.

[17] AMC § 5.10.010.

[18] AMC §§ 5.10.010, 5.10.040(A)(2).

[19] AMC § 5.50.060.

to conduct discovery,[20] subpoena witnesses and documents,[21] and hold hearings.[22]

When a private person or entity files a complaint with AERC, the agency is required to convene a fact-finding conference with the complainant and the respondent and attempt to negotiate a voluntary resolution of the complaint.[23] At least 21 days before the fact-finding conference, AERC is required to provide information and instructions about the conference to the parties.[24] At the conference, parties may be represented by legal counsel, but counsel may not cross-examine the other party and must submit any questions through AERC staff.[25]

AERC is required to investigate discrimination complaints promptly and impartially and to issue a determination within 240 days of the filing of the complaint.[26] If it determines that the allegations are not supported by substantial

---

[20] AMC § 5.50.070.

[21] AMC §§ 5.10.040(A)(3), 5.50.080.

[22] AMC §§ 5.10.040(A)(5), 5.70.010.

[23] AMC § 5.50.020(A).

[24] AMC § 5.50.020(B).

[25] AMC § 5.50.020(A).

[26] AMC §§ 5.50.010, 5.50.050.

evidence, AERC closes or dismisses the complaint.[27]  If instead it finds an unlawful discriminatory practice, AERC issues an order requiring cessation of the discriminatory conduct.[28]  A party against whom such an order is issued may appeal to the Alaska Superior Court.[29]

## The "Jessie Doe" Incident

"Jessie Doe" self-identifies as "female and transgender."[30]  On Friday, January 26, 2018, at about 6:00 p.m., Anchorage Police Department officers brought Doe to Hope Center.[31]  Doe smelled strongly of alcohol, was very agitated, was aggressive in body language, and had an open wound above one eye.[32]  Hope Center's Executive Director, Sherrie Laurie, informed Doe that because Hope Center did not accept individuals who were inebriated or under the influence of alcohol or drugs, Doe could not stay at the shelter.[33]  She recommended that Doe go to the hospital for medical care of the eye wound.[34]  Doe eventually agreed,

---

[27] AMC § 5.50.010.

[28] AMC § 5.70.140.

[29] AMC § 5.80.030(A).

[30] Docket 43-2 (AERC Discrimination Compl. No. 18-041).

[31] Docket 1 at 12 ¶ 89.

[32] *Id.* at 13 ¶¶ 91-92.

[33] *Id.* ¶ 94.

[34] *Id.* ¶ 96.

and Laurie paid for a cab to take Doe to the emergency room.[35]  At approximately

2:00 p.m. the next day, a Saturday, Doe returned to Hope Center and sought

admission, which was denied because Doe had not stayed the previous night, as

was required for Saturday admission prior to 5:45 p.m.[36]  Later, Laurie learned that

Doe had initiated a fight at another homeless shelter, the police had been called,

and Doe had been banned from the other homeless shelter until July 4, 2018.[37]

## Procedural History

On February 1, 2018, Doe filed a complaint ("First Complaint") with AERC,

alleging that Hope Center's shelter was a public accommodation and that Hope

Center had discriminated against Doe on the basis of sex and gender identity in

violation of AMC § 5.20.050.[38]  AERC informed Hope Center about the First

Complaint and scheduled a fact-finding conference for March 15, 2018.[39]  In a

detailed letter to AERC dated March 6, 2018, Hope Center explained that it did not

consider itself to be a public accommodation, that it had not discriminated against

Doe on the basis of gender identity, and that it "has First Amendment religious

---

[35] *Id.* ¶ 97.

[36] *Id.* ¶¶ 99–100.

[37] *Id.* ¶ 95.

[38] Docket 43-2.

[39] Docket 29-1 (Attachments to Motion for Preliminary Injunction) at 5.

liberty and association rights to operate as it does."[40] Hope Center asserted that the fact-finding conference should thus be cancelled and stated that it would not attend the conference and would file a motion to dismiss if AERC pursued the matter.[41] AERC pursued its investigation by serving interrogatories on Hope Center.[42] On April 23, 2018, Hope Center filed a motion to dismiss that focused on its assertion that its shelter is not a public accommodation covered by AMC § 5.20.050.[43] AERC responded with a proposed settlement agreement addressing Hope Center's "perceived misconduct."[44] On May 11, 2018, Hope Center declined the settlement proposal.[45]

On May 15, 2018, AERC filed a separate discrimination complaint against Hope Center and its attorney ("Second Complaint"), claiming that the attorney had made statements published in various media that stated or implied that transgender individuals would not be allowed to be sheltered at Hope Center, in violation of AMC § 5.20.020 and/or § 5.20.050.[46] AERC also set a fact-finding

---

[40] *Id.* at 4–5 (capitalization omitted).

[41] *Id.* at 5.

[42] Docket 1 at 20 ¶ 140.

[43] *Id.* at 21 ¶ 145; Docket 29-1 at 7. There is no indication in the record that AERC has ruled on that motion. *See* Docket 1 at 4 ¶ 18.

[44] Docket 1 at 21 ¶¶ 146–47.

[45] *Id.* at 21 ¶ 149.

[46] *Id.* at 22 ¶¶ 151-54.

conference and sent a "Request for Essential Information."[47]   Because of the

potential conflict caused by the Second Complaint against Hope Center's attorney,

Hope Center retained new counsel.[48]

On June 21, 2018, Hope Center's new counsel entered an appearance with

AERC on the Second Complaint.[49]   On June 29, 2018, AERC requested a

continuance of the fact-finding conference.[50]   It also expressed concerns that the

fact-finding conference, and the ordinance providing for it, lacked constitutional

procedures and protections.[51]   Finally, the letter noted that Hope Center would

supplement its interrogatory answers to include additional information on the

jurisdictional issues it intended to raise.[52]

AERC denied the continuance request and informed Hope Center that it still

expected the information it had sought in its "Request for Essential Information."[53]

---

[47] *Id.* ¶ 155.

[48] *Id.* at 23 ¶ 156.

[49] *Id.* ¶ 157.

[50] *Id.* ¶ 159 and at 24 ¶ 168.

[51] *Id.* at 23 ¶¶ 159, 162.

[52] *Id.* ¶ 160.

[53] *Id.* at 24–25 ¶¶ 169–70.

On July 5, 2018, Hope Center submitted its responses to that request.[54]  The same day, it also filed a motion to dismiss the Second Complaint for lack of jurisdiction.[55]

The fact-finding conference on the Second Complaint was held on July 9, 2018.[56]  At the conference, AERC told Hope Center that the agency had materials that contradicted Hope Center's discovery responses, but would not provide them to Hope Center at that time.[57]

On July 13, 2018, Hope Center's counsel emailed AERC to request the materials discussed at the fact-finding conference.[58]  In an emailed response, AERC stated that because the parties' immediate concern should be a settlement, it would not provide any supplemental information, nor would it require Hope Center to provide any supplemental information.[59]

On August 3, 2018, while settlement discussions were ongoing, AERC sent Hope Center's counsel an email that stated in part:

> [AERC's] ability to fully consider [Hope Center's] arguments will continue to be limited by [Hope Center's] failure to timely amend and correct its earlier responses.  [AERC] will allow [Hope Center] until August 9, 2018, to make appropriate corrections to the interrogatory responses before it takes any formal action in regards to what it views

---

[54] *Id.* at 25 ¶ 171.

[55] *Id.* ¶ 172.

[56] *Id.* at 27 ¶ 187.

[57] *Id.* ¶ 191.

[58] *Id.* ¶ 192.

[59] *Id.* ¶ 193.

as [Hope Center's] lack of candor about its receipt of taxpayer funds and the contractual obligations for the receipt of those funds.[60]

On August 9, 2018, Hope Center provided amended answers to a number of interrogatories that AERC had propounded to it; it indicated it did so not to correct alleged errors but to make clear that its original answers were truthful.[61]

Hope Center filed its Complaint in this Court on August 16, 2018, claiming violation of its First Amendment rights of freedom of religion, freedom of speech, and freedom of expressive association; violation of the Establishment Clause; violation of the Fourteenth Amendment rights of procedural due process and equal protection; and violation of its Alaska constitutional rights of freedom of religion, equal protection, and privacy.[62]    Thereafter, in October 2018, AERC administratively closed the Second Complaint.[63]    The First Complaint remains unresolved.[64]    In November 2018, AERC Executive Director Pamela Basler and AERC Chairperson Wanda Greene filed sworn statements in this case, attesting that "AERC has undertaken no enforcement action against [Hope Center]

---

[60] *Id.* at 28–29 ¶¶ 198–200.

[61] *Id.* at 29 ¶ 205.

[62] Docket 1.

[63] Docket 43-1 (AERC Closure).

[64] Docket 1 at 29 ¶ 207.

regarding" the First Complaint.[65]  They further certified that "AERC will undertake no investigative or enforcement actions regarding [the First Complaint] while this Court exercises jurisdiction in the matter."[66]

## Relevant Municipal Code Provisions

Title 5 of the AMC, entitled "Equal Rights," is intended to "guarantee fair and equal treatment under law to all people of the municipality, consistent with federal and state constitutional freedoms and laws, including freedom of expression, freedom of association and the free exercise of religion."[67]  Chapter 5.20 includes prohibitions on discriminatory practices in places of public accommodation[68] and in the sale, rental, or use of real property.[69]

Section 5.20.050, "Unlawful practices in places of public accommodation," provides in relevant part:

> A. It is unlawful for a person, whether the owner, operator, agent or employee of an owner or operator of a public accommodation, to:
>
> > 1. Refuse, withhold from or deny to a person any of its accommodations, advantages, facilities, benefits, privileges, services or goods of that place on account of . . . sex [or] gender identity . . . .

---

[65] Docket 53 (Basler Aff.) at 2, ¶ 2; Docket 59-1 (Greene Aff.) at 2, ¶ 2.

[66] Docket 53 at 2, ¶ 3; Docket 59-1 at 2, ¶ 3.

[67] AMC § 5.10.

[68] AMC § 5.20.050.

[69] AMC § 5.20.020.

2. Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies that:

   a. Any of the services, goods, facilities, benefits, accommodations, advantages or privileges of the public accommodation will be refused, withheld from or denied to a person of a certain . . . sex [or] gender identity . . .; or

   b. The patronage or presence of a person belonging to a particular . . . sex [or] gender identity . . . is unwelcome, not desired, not solicited, objectionable or unacceptable.

"Public accommodation" is defined in the AMC as "any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general public, subject only to the conditions and limitations established by law and applicable alike to all persons."[70]

Although the First Complaint was only brought pursuant to Section 5.20.050, also relevant to this dispute is Section 5.20.020, "Unlawful practices in the sale, rental or use of real property," which provides in relevant part:

A. With the exception of those conditions described in section 5.25.030A. as "lawful practices", it is unlawful for the owner, lessor, manager, agent, brokerage service, or other person having the right to sell, lease, rent, [or] advertise . . . real property to:

   1. Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a person because of . . . sex [or] gender identity . . . .

---

[70] AMC § 5.20.010.

2. Discriminate against a person because of . . . sex [or] gender identity . . . in a term, condition or privilege relating to the use . . . of real property. . . .

7. Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification or discrimination based on . . . sex [or] gender identity . . . .

Section 5.25.030, "Lawful practices," provides in relevant part:

A. Notwithstanding the provisions of this chapter, it shall not apply with respect to the following conditions: . . .

9. The establishment of a hospital, convent, monastery, shelter, asylum, or residential facility for the care and lodging of persons in need of special medical, rehabilitative, social, or psychological support, including, but not limited to . . . shelters for the homeless.

## JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction with respect to the state law claims pursuant to 28 U.S.C. § 1367.

## DISCUSSION

## I. MOTION FOR FEDERAL ABSTENTION

As a threshold matter, Anchorage asserts that the Court should abstain from exercising jurisdiction under the *Younger* doctrine.[71]

---

[71] *Younger v. Harris*, 401 U.S. 37 (1971).

## A. Legal Standard

"Abstention from the exercise of federal jurisdiction is the exception, not the rule."[72] "[F]ederal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not refuse to decide a case in deference to the states."[73] The Supreme Court has instructed that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them."[74]

However, in "exceptional circumstances," a federal court may abstain from exercising its jurisdiction "where denying a federal forum would clearly serve an important countervailing interest."[75] One such circumstance is *Younger* abstention, in which "concerns for comity and federalism" make abstention appropriate when a particular type of state proceeding is pending.[76]

---

[72] *Colo. River Water Conservation Dist. v. U.S.*, 424 U.S. 800, 813 (1976).

[73] *Sprint Commc'ns., Inc. v. Jacobs*, 571 U.S. 69, 73 (2013) (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368 *(NOPSI)*) (internal quotation marks and alteration omitted).

[74] *Colo. River Water Conservation Dist.*, 424 U.S. at 817.

[75] *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 716 (1996) (internal quotation marks omitted) (surveying various types of federal abstention).

[76] *See, e.g.*, *Ohio Civil Rights Comm'n v. Dayton Christian Schs.*, 477 U.S. 619, 627 (1986) (surveying *Younger* line of cases).

"A federal court may abstain under *Younger* in three categories of cases: '(1) parallel, pending state criminal proceedings, (2) state civil proceedings that are akin to criminal prosecutions, and (3) state civil proceedings that implicate a State's interest in enforcing the orders and judgments of its courts.'"[77]  In addition to falling into one of the three categories, to warrant *Younger* abstention "the state proceeding must be (1) 'ongoing,' (2) 'implicate important state interests,' and (3) provide 'an adequate opportunity . . . to raise constitutional challenges.'"[78]  If those threshold elements are met, a federal court may abstain under *Younger* if the federal action would have the practical effect of enjoining the state proceedings and no other exception to *Younger* applies.[79]

Here, the proceedings before AERC are clearly not category (1) or (3) proceedings.  At issue is whether the proceeding before AERC falls within category (2); that is, whether the AERC proceeding is a state civil proceeding that is akin to a criminal prosecution.  The Ninth Circuit has described this category of cases as "quasi-criminal enforcement actions."[80]  Although the Ninth Circuit has not directly addressed the issue, several federal courts have concluded that when the pending

---

[77] *Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019) (quoting *ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 759 (9th Cir. 2014)).

[78] *Id.* at 1044 (quoting *Middlesex Cty. Ethics Comm. v. Garden State Bar Ass'n*, 457 U.S. 423, 432 (1982)).

[79] *ReadyLink*, 754 F.3d at 759.

[80] *Id.*

state proceedings are at the investigative stage, the state proceeding is not a "quasi-criminal enforcement action." For example, in *Telco Communications, Inc. v. Carbaugh*, a state agency notified a fundraising company that the agency had received a complaint alleging prohibited conduct and asked the company to attend an informal factfinding conference.[81] After attending the conference, the company filed a federal suit seeking protection against action by the agency on First Amendment grounds, among other claims.[82] The Fourth Circuit held "that the period between the threat of enforcement and the onset of formal enforcement proceedings may be an appropriate time for a litigant to bring its First Amendment challenges in federal court."[83] As the court explained:

> Where no formal enforcement action has been undertaken, any disruption of state process will be slight. . . . Appellant's contention—that abstention is required whenever enforcement is threatened—would leave a party's constitutional rights in limbo while an agency contemplates enforcement but does not undertake it. A federal plaintiff would be placed "between the Scylla of intentionally flouting state law and the Charybdis of forgoing what [it] believes to be constitutionally protected activity in order to avoid becoming enmeshed" in enforcement proceedings.[84]

---

[81] 885 F.2d 1225, 1227 (4th Cir. 1989).

[82] *Id.*

[83] *Id.* at 1229.

[84] *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)) (citing *Wulp v. Corcoran*, 454 F.2d 826, 831 (1st Cir. 1972)).

Noting that the agency had not initiated formal enforcement proceedings against the company, the Fourth Circuit upheld the district court's decision not to abstain.[85]

The First Circuit applied a similar approach in *Guillemard-Ginorio v. Contreras-Gomez.*[86] There, the Office of the Insurance Commissioner of Puerto Rico ("OIC") had notified the plaintiff insurance agency and its principals that they were being investigated; it commenced an investigation but had not brought charges prior to the initiation of the federal case. Noting that "no formal enforcement action ha[d] been undertaken" against the company or its principals, the First Circuit concluded "that the agency's investigation of the plaintiffs was at too preliminary a stage to constitute a 'proceeding' triggering *Younger* abstention."[87] Based in part on this conclusion, the circuit court held that the district court properly denied abstention.[88] Other federal courts have reached similar conclusions.[89]

---

[85] *Id.* at 1228, 1230.

[86] 585 F.3d 508 (1st Cir. 2009).

[87] *Id.* at 519, 520.

[88] *Id.* at 523.

[89] *See, e.g.*, *Mulholland v. Marion Election Bd.*, 746 F.3d 811, 817 (7th Cir. 2014) (state investigatory proceedings were at too preliminary a stage to warrant federal deference); *La. Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1490–91 (5th Cir. 1995) (district court's ruling that there was no ongoing proceeding did not constitute abuse of discretion where "[s]ubsequent to . . . complaints being filed with the Commission against the [plaintiffs] . . . the only administrative activity ha[d] been" letters issued to plaintiffs advising them of the allegations); *Myers v. Thompson*, 192 F. Supp. 3d 1129, 1137 (D. Mont. 2016) ("While a proceeding before [Montana's Office of Disciplinary Counsel ("ODC")] has the potential to be 'akin to criminal proceedings,'

## B. Analysis

Because the underlying state proceeding in this case is an administrative proceeding, *Younger* abstention is appropriate only if that proceeding is a "quasi-criminal enforcement action."[90]  But at the time this action was filed, the AERC proceeding was not a quasi-criminal enforcement action; rather, that proceeding was in the investigative phase.  AERC had not yet determined whether Hope Center's conduct violated the AMC provisions at issue, or even whether AERC has jurisdiction regarding the First Complaint.[91]  Indeed, in November 2018, AERC's Executive Director and its Chairperson both certified that "AERC has undertaken no enforcement action against Plaintiff regarding" the First Complaint.[92]  Like the state court proceedings at issue in *Telco Communications, Inc.*, *Guillemard-Ginorio*, and the other federal cases cited above, the AERC proceeding is not a "quasi-criminal enforcement action" that would justify *Younger* abstention by this Court.

---

ODC's investigation into this case has not progressed beyond the investigation stage. Other courts have determined that investigation proceedings, without more, do not trigger *Younger*." (citations omitted)); *cf. ReadyLink Healthcare, Inc. v. State Comp. Ins. Fund*, 754 F.3d 754, 760 (9th Cir. 2014) ("[I]f the mere 'initiation' of a judicial or quasi-judicial administrative proceeding were an act of civil enforcement, *Younger* would extend to every case in which a state judicial officer resolves a dispute between two private parties.").

[90] *ReadyLink*, 754 F.3d at 758; *see Herrera v. City of Palmdale*, 918 F.3d 1037, 1043 (9th Cir. 2019).

[91] Docket 53 at 2; Docket 59-1 at 2.

[92] Docket 53 at 2; Docket 59-1 at 2.

Anchorage contends that this case is analogous to *Ohio Civil Rights Commission v. Dayton Christian Schools, Inc.*[93] and *Middlesex County Ethics Commission v. Garden State Bar Association*.[94] Both cases, however, are distinguishable from the case at hand, because "the regulating agencies in those cases had investigated the allegations, made determinations that probable cause existed, and served formal charges on the entities."[95] As noted above, the AERC proceeding against Hope Center did not progress past the investigatory stage. "In short, the state action [in *Dayton Christian Schools* and *Middlesex*] had progressed significantly beyond that here."[96]

Because the state proceeding before AERC regarding the First Complaint is not a "quasi-criminal enforcement action," *Younger* abstention is not appropriate. Accordingly, Anchorage's motion for federal abstention will be denied.[97]

---

[93] 477 U.S. 619 (1986); *see* Docket 61 at 4–7.

[94] 457 U.S. 423, 431 (1982).

[95] *La. Debating & Literary Ass'n v. City of New Orleans*, 42 F.3d 1483, 1490 (5th Cir. 1995) (citing *Dayton Christian Schs.*, 477 U.S. at 623–24; *Middlesex*, 457 U.S. at 428).

[96] *Id.*

[97] In light of this conclusion, the Court does not reach the three-part test articulated in *Herrara* or determine whether other considerations would preclude *Younger* abstention. *See Herrera v. City of Palmdale*, 918 F.3d 1037, 1044 (9th Cir. 2019); *ReadyLink*, 754 F.3d at 759.

## II. MOTION TO STAY PROCEEDINGS

Anchorage moved to stay all proceedings in this case pending a ruling on Anchorage's motion for abstention.[98]  For the reasons discussed in Section I. above, the Court is denying Anchorage's motion for abstention.  Accordingly, Anchorage's motion to stay will be denied as moot.

## III. MOTION TO SUPPLEMENT OR FOR JUDICIAL NOTICE

Hope Center moves to supplement its Motion for Preliminary Injunction with several sealed documents.  In the alternative, Hope Center requests that the Court take judicial notice of the documents.[99]  Anchorage contends that Hope Center has offered no explanation as to why the relevance of the sealed documents was not appreciated until after briefing was complete, and that accordingly Hope Center's motion does not satisfy the requirements for supplementation pursuant to Alaska Local Civil Rule 7.1(d).[100]  While the Court finds the sealed documents to be of

---

[98] Docket 44.

[99] Docket 79 at 2.

[100] Docket 95 at 3–4.

In relevant part, Rule 7.1(d) reads as follows:

> [A]fter briefing of a motion is complete, supplementation of factual materials may occur only by motion for good cause. The motion must have the proposed factual materials attached as an exhibit and address the reasons earlier filing was not possible or their relevance was not appreciated.  Such motions will not routinely be granted.

limited relevance to the pending motions, the Court will allow Hope Center to supplement its Motion for Preliminary Injunction with these documents. Accordingly, the Court does not address Hope Center's request that the Court take judicial notice of the documents.

## IV. MOTION FOR PRELIMINARY INJUNCTION

### A. Legal Standard

Hope Center moves for "a preliminary injunction to stop Defendants from applying Anchorage Municipal Code, Title 5, § 5.20.050 and § 5.20.020 in a manner that violates Hope Center's rights under the First and Fourteenth Amendments of the U.S. Constitution and under Article 1, §§ 1, 4, and 22 of the Alaska Constitution."[101]

A party moving for a preliminary injunction must make a "clear showing of each element of standing."[102] "[T]he irreducible constitutional minimum of standing" consists of three elements: injury in fact, causation, and a likelihood that

---

[101] Docket 29 at 2, ¶ 1.

[102] *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). Although the parties do not address standing in their briefing on this motion, the Court addresses it on its own initiative. *See D'Lil v. Best W. Encina Lodge & Suites*, 538 F.3d 1031, 1035 (9th Cir. 2008) ("[B]oth the Supreme Court and this court have held that whether or not the parties raise the issue, '[f]ederal courts are *required* sua sponte to examine jurisdictional issues such as standing.'" (emphasis in original) (quoting *Bernhardt v. County of Los Angeles*, 279 F.3d 862, 868 (9th Cir. 2001)) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995))).

a favorable decision will redress the plaintiff's alleged injury.[103] When challenging

a law prior to its enforcement, a plaintiff satisfies the injury in fact requirement

where the plaintiff "intends to engage in 'a course of conduct arguably affected with

a constitutional interest' and [] there is a credible threat that the challenged

provision will be invoked against the plaintiff."[104] "First Amendment challenges

'present unique standing considerations' because of the 'chilling effect of sweeping

restrictions' on speech."[105] Accordingly, "when the threatened enforcement effort

implicates First Amendment rights, the inquiry tilts dramatically toward a finding of

standing."[106] "Even in the First Amendment context," however, "a plaintiff must

show a credible threat of enforcement."[107] "In determining whether a plaintiff faces

[] a credible threat in the pre-enforcement context, this Court considers three

factors: (1) the likelihood that the law will be enforced against the plaintiff; (2)

whether the plaintiff has shown, 'with some degree of concrete detail,' that [it]

intends to violate the challenged law; and (3) whether the law even applies to the

---

[103] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).

[104] *LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1154–55 (9th Cir. 2000) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).

[105] *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171 (9th Cir. 2018) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless (ARLPAC)*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

[106] *LSO*, 205 F.3d at 1155.

[107] *Italian Colors*, 878 F.3d at 1171.

plaintiff."[108]   When a plaintiff challenges the enforcement of multiple legal provisions, a court considers separately whether the plaintiff has standing to challenge the enforcement of each provision at issue.[109]

In addition to standing, plaintiffs seeking preliminary injunctive relief must establish that "(1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) a preliminary injunction is in the public interest."[110]  "Under the sliding scale approach to preliminary injunctions observed in [the Ninth Circuit], the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another."[111]  But in any event, even with the sliding-scale approach, "plaintiffs must

---

[108] *Id.* at 1171–72 (9th Cir. 2018) (quoting *Lopez v. Candaele*, 630 F.3d 775, 786 (9th Cir. 2010)).

[109] *See, e.g.*, *McCormack v. Hiedeman*, 694 F.3d 1004, 1025 (9th Cir. 2012).

[110] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009) (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Anchorage contends that "[b]eause the government is a party to these proceedings, the final two factors of a preliminary injunction analysis . . . merge."  Docket 52 at 17 (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)).  The cases this Court has reviewed have merged these factors when the *federal* government is a party to the proceeding.  *See, e.g.*, *Cty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 539 (N.D. Cal.), *reconsideration denied*, 267 F. Supp. 3d 1201 (N.D. Cal. 2017), *appeal dismissed as moot sub nom. City & Cty. of San Francisco v. Trump*, No. 17-16886, 2018 WL 1401847 (9th Cir. Jan. 4, 2018) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

[111] *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012) (citation and internal quotation marks omitted).  *See also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction."[112]  Injunctive relief is an equitable remedy, and "[t]he essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case."[113]

## B. Analysis

### 1. *Standing to seek a preliminary injunction*

A federal court has "an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it."[114]  "A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit."[115]  The Court therefore first considers on its own initiative whether Hope Center has standing to challenge the enforcement of AMC §§ 5.20.020 and 5.20.050.[116]  The

---

1131–35 (2011) (discussing post-*Winter* circuit split over continuing viability of sliding-scale approach and joining Seventh and Second Circuits in retaining it).

[112] *All. for the Wild Rockies*, 632 F.3d at 1131 (citing *Winter*, 555 U.S. at 22) (emphasis in original).

[113] *Sierra Forest*, 577 F.3d at 1022 (quoting *United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir. 1987)).

[114] *Hertz Corp. v. Friend*, 559 U.S. 77, 94 (2010) (citations omitted).

[115] *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)).

[116] *See supra* note 102.

Court addresses separately Hope Center's standing to challenge each provision.[117]

The Court first turns to the public accommodation provision, AMC § 5.20.050. Doe's First Complaint cited to this provision, but that AERC proceeding has not progressed past the investigatory phase. Accordingly, the Court must determine whether Hope Center has suffered "a credible threat in the pre-enforcement context."[118] To that end, the Court will consider (1) the likelihood that the law will be enforced against Hope Center; (2) whether Hope Center has shown, "with some degree of concrete detail," that it intends to violate the challenged law; and (3) whether the law even applies to Hope Center.[119]

Considering these factors, the Court is satisfied that Hope Center has established a credible threat of enforcement with respect to AMC § 5.20.050. First, AMC § 5.20.050 prohibits public accommodations from discriminating on the basis of sex or gender identity. Unlike AMC § 5.20.020, § 5.20.050 does not include language explicitly exempting homeless shelters from that prohibition.[120] Accordingly, Hope Center's intended conduct "arguably falls within the [provision's]

---

[117] *See McCormack v. Hiedeman*, 694 F.3d 1004, 1025 (9th Cir. 2012).

[118] *Italian Colors Rest. v. Becerra*, 878 F.3d 1165, 1171–72 (9th Cir. 2018).

[119] *Id.* at 1172.

[120] In its briefing before the AERC, Hope Center contended that the "lawful practices" exemption extends to AMC § 5.20.050. In light of the analysis below, the Court assumes, without deciding, that the exemption applies only to AMC § 5.20.020.

reach."[121]   Turning to the likelihood of enforcement, there is currently an "impending proceeding" against Hope Center that was initiated pursuant to AMC § 5.20.050.[122]   AERC has not suggested that the provision would not be enforced if it were violated, nor had the provision "fallen into desuetude."[123]   Indeed, after the First Complaint was filed, AERC's executive director initiated a second AERC proceeding against Hope Center pursuant to AMC § 5.20.050.[124]   Accordingly, Hope Center's assertion that they are refraining from engaging in certain conduct for fear of an enforcement action against it under this provision is reasonable. Finally, Hope Center has shown that it has a concrete plan to engage in conduct that arguably violates the provision.   Among other assertions, Hope Center has declared a specific intent to post, publish, or circulate its admittance policy or portions of it.[125]   Based on the foregoing, the Court concludes that Hope Center has standing to challenge AMC § 5.20.050.

---

[121] *See Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (quoting *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)).

[122] *See Italian Colors*, 878 F.3d at 1173.

[123] *Id.* (quoting *Arizona Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1007 (9th Cir. 2003)).

[124] The Second Complaint also cited AMC § 5.20.050.   *See* Docket 28-5 (AERC Discrimination Compl. No. 18-167).

[125] Docket 1 at 10–11 ¶ 71, 30 ¶ 210.

Turning to AMC § 5.20.020, the Court must determine whether Hope Center has suffered "a credible threat in the pre-enforcement context" with respect to this code provision.[126]  This provision presents a closer question, as two of the three factors suggest that Hope Center does not face a credible threat of enforcement: First, AMC § 5.20.020 explicitly exempts homeless shelters.  Even in cases that may implicate First Amendment rights, courts have found that claims of future harm lack credibility where, as here, the provision in question "clearly fails to cover [the plaintiff's] conduct."[127]  Second, Hope Center does not appear to have alleged a concrete plan to engage in conduct that arguably violates the provision; because Hope Center is a homeless shelter, the provision's prohibitions on sex and gender discrimination would not appear to cover Hope Center's proposed conduct.

Although two factors suggest that Hope Center does not face a credible threat of enforcement with respect to AMC § 5.20.020, the third factor weighs heavily in Hope Center's favor.  The First Complaint against Hope Center was filed only pursuant to AMC § 5.20.050; but the Second Complaint was filed pursuant to both AMC § 5.20.020 and AMC § 5.20.050.  And while the First Complaint was filed by Doe, the Second Complaint was filed by AERC's Executive Director.[128]

---

[126] *Italian Colors*, 878 F.3d at 1171–72.

[127] *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (alteration in original) (quoting *Majors v. Abell*, 317 F.3d 719, 721 (7th Cir. 2003)).

[128] Docket 28-5.

Although AERC later dismissed the Second Complaint, the agency has not explained the basis for that dismissal. And while AMC § 5.20.020 is not implicated in any ongoing AERC proceeding, the record does not indicate that the agency has "disavow[ed] application of the challenged provision" to Hope Center in the future.[129]

Based on the foregoing, the Court finds that the "likelihood of enforcement" factor weighs in Hope Center's favor. Further, "keeping in mind that 'when the threatened enforcement effort implicates First Amendment rights, the [standing] inquiry tilts dramatically toward a finding of standing,'" the Court concludes that Hope Center has established a credible threat of enforcement as to AMC § 5.20.020.[130] Furthermore, the alleged injury is traceable to AMC § 5.20.020 and would likely be redressed by a favorable decision enjoining enforcement of the provision. Accordingly, Hope Center has standing to challenge AMC § 5.20.020.

### 2. Preliminary injunctive relief

#### a. Likelihood of success on the merits

Hope Center contends that a preliminary injunction is appropriate because AMC §§ 5.20.020 and 5.20.050 are unconstitutional as-applied to the

---

[129] *See LSO, Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000) ("Courts have also considered the Government's failure to disavow application of the challenged provision as a factor in favor of a finding of standing.").

[130] *Italian Colors*, 878 F.3d at 1174 (quoting *LSO*, 205 F.3d at 1155).

constitutionally protected activities of Hope Center and its agents.[131]  However, "[i]t is a well-established principle governing the prudent exercise of [the federal court's] jurisdiction that normally the Court will not decide a constitutional question if there is some other ground upon which to dispose of the case."[132]  Here, Hope Center also contends that AMC § 5.20.020 does not apply to "shelters for the homeless" and that Hope Center is not a "public accommodation" within the meaning of AMC § 5.20.050.[133]  If that is the case, then Anchorage would not be able to enforce these provisions against Hope Center, irrespective of their constitutionality.  Accordingly, the Court will first consider whether either of these code provisions apply to Hope Center's overnight living space for homeless persons.

Determining whether AMC §§ 5.20.020 and 5.20.050 apply to Hope Center's homeless shelter requires interpretation of the Anchorage Municipal Code.  "The interpretation of municipal ordinances and charters "is governed by rules of

---

[131] Docket 29 at 1, 3–4.

[132] *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (quoting *Escambia County v. McMillan*, 466 U.S. 48, 51 (1984)); *cf. United States v. Vargas*, 915 F.3d 417, 420 (7th Cir. 2019) ("Vargas presents almost all of his argument in constitutional terms, asserting that the judge violated the Due Process Clause of the Fifth Amendment. . . . It is, for him, the Constitution or nothing[.] . . . This is a hopeless strategy, because courts are obliged to consider statutory and rule-based arguments ahead of constitutional ones.").

[133] *See* Docket 1 at 3, ¶ 10; 40, ¶ 288; 47, ¶ 341; 50, ¶ 367; Docket 29-1 at 4.

statutory construction."[134]  Federal courts apply state rules of statutory construction when interpreting municipal laws.[135]  Alaska courts "apply the same rules of interpretation" when construing statutes and municipal ordinances.[136]  The Alaska Supreme Court has explained Alaska's rules of statutory interpretation as follows:

> Interpretation of a statute begins with its text.  In addition to the text, we also consider a statute's legislative history and purpose.  In construing a statute, we have adopted a sliding scale approach whereby the plainer the statutory language is, the more convincing the evidence of contrary legislative purpose or intent must be. Whenever possible we interpret each part or section of a statute with every other part or section, so as to create a harmonious whole.[137]

The Alaska Supreme Court has also held that "[w]here an agency interprets its own regulations, a deferential standard of review properly recognizes that the agency is best able to discern its intent in promulgating the regulation at issue."[138]

---

[134] *Canfield v. Sullivan*, 774 F.2d 1466, 1468–69 (9th Cir. 1985) (citation omitted).

[135] *See id.*; *see also McGraw v. City of Huntington Beach*, 882 F.2d 384, 387–88 (9th Cir. 1989).

[136] *Cent. Recycling Servs., Inc. v. Municipality of Anchorage*, 389 P.3d 54, 57 (Alaska 2017).

[137] *Mat-Su Valley Med. Ctr., LLC v. Bolinder*, 427 P.3d 754, 763 (Alaska 2018), *reh'g denied* (Oct. 10, 2018) (citations and quotations omitted).

[138] *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 284 n.13 (Alaska 1994) (citation omitted).

With these principles in mind, the Court first turns to AMC § 5.20.020. In relevant part, the provision states that it is unlawful for certain persons, including an owner of real property,[139] to:

> 1. Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a person because of . . . sex [or] gender identity . . . .
>
> 2. Discriminate against a person because of . . . sex [or] gender identity . . . in a term, condition or privilege relating to the use . . . of real property. . . .
>
> 7. Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification or discrimination based on . . . sex [or] gender identity . . . .

The provision also states that these prohibitions do not apply to "those conditions described in section 5.25.030A as "lawful practices." In relevant part, AMC § 5.25.030 defines "lawful practices" to include:

> 9. The establishment of a hospital, convent, monastery, shelter, asylum, or residential facility for the care and lodging of persons in need of special medical, rehabilitative, social, or psychological support, including, but not limited to . . . shelters for the homeless.

It is clear from the structure and plain text of these provisions that the drafters of the AMC intended to exempt homeless shelters from the prohibitions on conduct

---

[139] AMC § 5.20.020 applies to "the owner, lessor, manager, agent, brokerage service, or other person having the right to sell, lease, rent, advertise, or an owner's association having the powers of governance and operation of real property."

articulated in AMC § 5.20.020. Furthermore, the Alaska Supreme Court has concluded that "[t]he purpose of AMC 5.20.020 . . . is to prohibit discrimination in the rental housing market."[140] Applying the provision's prohibitions to Hope Center's homeless shelter would not further this purpose. Hope Center is thus likely to succeed as to its contention that AMC § 5.20.020 does not apply to Hope Center's homeless shelter.

The Court next turns to AMC § 5.20.050. In relevant part, the provision states that it is unlawful for the "owner or operator of a public accommodation" to:

1. Refuse, withhold from or deny to a person any of its accommodations, advantages, facilities, benefits, privileges, services or goods of that place on account of . . . sex [or] gender identity . . . .

2. Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies that:

   a. Any of the services, goods, facilities, benefits, accommodations, advantages or privileges of the public accommodation will be refused, withheld from or denied to a person of a certain . . . sex [or] gender identity . . . ; or

   b. The patronage or presence of a person belonging to a particular . . . sex [or] gender identity . . . is unwelcome, not desired, not solicited, objectionable or unacceptable.

---

[140] *Swanner*, 874 P.2d at 280 (footnote omitted).

To determine whether these prohibitions apply to Hope Center, the Court must consider whether Hope Center is an "owner or operator of a public accommodation" within the meaning of the AMC. The AMC defines "public accommodation" as "any business or professional activity that is open to, accepts or solicits the patronage of, or caters or offers goods or services to the general public, subject only to the conditions and limitations established by law and applicable alike to all persons."[141]

In contrast to AMC § 5.20.020, § 5.20.050 does not include language that expressly exempts homeless shelters from its prohibitions.[142] Nevertheless, Alaska's rules of statutory interpretation and the structure of the Anchorage Municipal Code as a whole suggest that homeless shelters are not public accommodations as defined in AMC § 5.20.050. For if the term "public accommodation" in AMC § 5.20.050 is read to apply to homeless shelters, then the exemption for homeless shelters contained in AMC § 5.20.020 would have no effect.[143] Pursuant to Alaska Supreme Court precedent, this Court must "interpret

---

[141] AMC § 5.20.010.

[142] In its briefing before the AERC, Hope Center contended that the "lawful practices" exemption extends to AMC § 5.20.050. In light of the analysis below, the Court assumes, without deciding, that the exemption applies only to AMC § 5.20.020.

[143] While the language used in the two provisions is slightly different, the conduct prohibited by the two provisions is essentially identical. *Compare* 5.20.020(A)(1)–(2) ("Refuse to sell, lease or rent, or to otherwise make unavailable, the real property to a person because of . . . sex [or] gender identity [or] . . . . Discriminate against a person because of . . . sex [or] gender identity . . . in a term, condition or privilege relating to the use . . . of real property. . . .") *with* 5.20.050(A)(1)(" Refuse, withhold from or deny to a

each part or section of a statute [or municipal code] with every other part or section, so as to create a harmonious whole."[144] To give effect to the exemption for homeless shelters contained in AMC § 5.20.020, the Court concludes that Hope Center is not an "owner or operator of a public accommodation" within the meaning of AMC § 5.20.050.[145] Hope Center is thus likely to succeed as to its contention that AMC § 5.20.050 does not apply to Hope Center's homeless shelter. Because neither of the AMC provisions at issue appear to apply to Hope Center's homeless shelter, it has a "likelihood of success on the merits" as to its claims.

---

person any of its accommodations, advantages, facilities, benefits, privileges, services or goods of that place on account of . . . sex [or] gender identity . . . ."); *compare* 5.20.20(A)(7) ("Circulate, issue or display, make, print or publish, or cause to be made or displayed, printed or published, any communication, sign, notice, statement or advertisement with respect to the use . . . of real property that indicates any preference, limitation, specification or discrimination based on . . . sex [or] gender identity . . . .") *with* 5.20.50(A)(2) ("Publish, circulate, issue, display, post or mail a written or printed communication, notice or advertisement which states or implies that: [] Any of the services, goods, facilities, benefits, accommodations, advantages or privileges of the public accommodation will be refused, withheld from or denied to a person of a certain . . . . sex [or] gender identity . . . ; or . . . The patronage or presence of a person belonging to a particular . . . sex [or] gender identity . . . is unwelcome, not desired, not solicited, objectionable or unacceptable.").

[144] *Mat-Su Valley Med. Ctr., LLC v. Bolinder*, 427 P.3d 754, 763 (Alaska 2018), *reh'g denied* (Oct. 10, 2018) (citations and quotations omitted).

[145] This conclusion may seem at odds with the Court's standing analysis. *See supra* note 121 and accompanying text. However, Ninth Circuit precedent indicates that at the standing stage, the applicability factor weighs in favor of standing if conduct "*arguably* falls within the [provision's] reach." *Lopez v. Candaele*, 630 F.3d 775, 788 (9th Cir. 2010) (emphasis added) (citing *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1095 (9th Cir. 2003)). In contrast, the question at this stage is whether Hope Center would likely succeed on the merits.

b. Likelihood of irreparable harm in the absence of preliminary relief

Irreparable harm "analysis focuses on irreparability, 'irrespective of the magnitude of the injury.'"[146] "A threat of irreparable harm is sufficiently immediate to warrant preliminary injunctive relief if the plaintiff 'is likely to suffer irreparable harm before a decision on the merits can be rendered.'"[147]

Hope Center alleges injury in the form of interference with its constitutional rights.[148] Hope Center also alleges that the code provisions at issue have "hindered [Hope Center's] ability to raise funds, leaving it in a tenuous financial state."[149] Additionally, Hope Center contends that enforcement of AMC §§ 5.20.020 and 5.20.050 against Hope Center would impede its ability to provide overnight living space for homeless persons.[150] Anchorage asserts that Hope Center has failed to "demonstrate that irreparable injury is *likely* in the absence of

---

[146] *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018), *cert. denied sub nom. Little Sisters of the Poor Jeanne Jugan Residence v. California*, No. 18-1192, 2019 WL 1207008 (U.S. June 17, 2019) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)).

[147] *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)).

[148] Docket 30 at 29; *see* Docket 63 at 13 ("Anchorage's acts either chill Hope Center's speech or threaten imminent enforcement that will stop Hope Center from operating consistent with its beliefs.").

[149] Docket 56 at 28 ("Hope Center's women's shelter will likely close its doors if it does not get equitable relief from this Court.").

[150] Docket 1 at 30 ¶¶ 212–15.

an injunction, not merely that it is possible."[151]   It also asserts that Hope Center has not shown that its alleged financial injury would be irreparable.[152]

Here, Hope Center has established a sufficient likelihood of irreparable harm resulting from restrictions on Hope Center's ability to provide overnight living space to homeless persons.   In *Hawaii v. Trump*, the Ninth Circuit found that Hawaii's "inability to assist in refugee resettlement" weighed in favor of finding a likelihood of irreparable harm to the State.[153]   Similarly, in *Doe v. Trump*, the District Court for the Western District of Washington found irreparable harm when the plaintiff organizations "ha[d] built programs specifically to serve Muslim and Arabic-speaking refugees," and government action would impede their ability to continue providing services to those populations.[154]   The harms alleged in those cases are similar to those at issue here.   Declarations from persons who have used Hope Center's overnight living space provide additional support for Hope Center's

---

[151] Docket 52 at 14 (quoting *Arc. of California v. Douglas*, 757 F.3d 975, 990 (9th Cir. 2014)).

[152] Docket 75 at 37–38.

[153] 859 F.3d 741, 782 (9th Cir.), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080 (2017), *vacated and remanded on other grounds*, 138 S. Ct. 37 (2017).

[154] 288 F. Supp. 3d 1045, 1083 (W.D. Wash. 2017), *reconsideration denied*, 284 F. Supp. 3d 1182 (W.D. Wash. 2018); *see also Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 739 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ("Although the funding denied to [the agency] could be reimbursed, [the agency] has presented evidence that, in the interim, its organizational objectives would be irreparably damaged by its inability to provide adequate social services to its clients.").

contention that it would have difficulty serving its target population if AMC §§ 5.20.020 and 5.20.050 were enforced against the shelter.[155]   Based on the foregoing, the Court concludes that Hope Center has demonstrated that it is likely to suffer irreparable harm in the absence of preliminary injunctive relief.

### c. Balance of the equities

The third requirement that a moving party must show in order to obtain a preliminary injunction is that the balance of equities tips in its favor.[156]   "[T]he very purpose of a preliminary injunction . . . is to preserve the status quo and the rights of the parties until a final judgment issues in the cause."[157]   One factor considered by courts when balancing the equities is whether a mandatory or prohibitory injunction is sought; the latter is considered substantially less burdensome to the defendant.[158]

Hope Center contends that the equities favor it because the Code provisions at issue "irreparably harm Hope Center's constitutional freedoms and significantly hinder its ministry"; in contrast, it maintains that "Anchorage can achieve any valid

---

[155] Docket 34 (S.D. Decl.); Docket 35 (G.O. Decl.); Docket 36 (F.S. Decl.).

[156] *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009).

[157] *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

[158] *See, e.g.*, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009).

interest through laws already on the books."[159]  Anchorage responds that it has

"a substantial interest in (1) the comity of the courts and the orderly administration

of ongoing state proceedings . . . and (2) enforcing AMC § 5.20.050, which serves

the fundamentally important purpose of protecting the rights of all protected

classes in the Municipality of Anchorage."[160]  Anchorage also contends that Hope

Center "seeks to alter the *status quo* by . . . posting its policies and beliefs

regarding sex and gender identity."[161]

Hope Center seeks to enjoin Anchorage from enforcing AMC §§ 5.20.020

and 5.20.050 against it.  In that regard, Hope Center seeks to preserve the status

quo at its homeless shelter.[162]  Additionally, Hope Center is not asking the Court

to order Anchorage to take any specific action.  And while Anchorage undoubtedly

has an interest in enforcing the city's anti-discrimination provisions, the issuance

of a preliminary injunction in this instance would not unduly limit Anchorage's ability

to do so, as the actions Hope Center seeks to enjoin appear to be beyond the

scope of the relevant provisions.[163]

---

[159] Docket 30 at 29–30.

[160] Docket 52 at 19.

[161] Docket 52 at 18.

[162] *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1060 (9th Cir. 2014) (stating that "status quo" refers to status quo refers to the "legally relevant relationship between the parties before the controversy arose" (emphasis omitted)).

[163] *Cf. Hawaii v. Trump*, 859 F.3d 741, 783 (9th Cir.), *cert. granted sub nom. Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, (2017), vacated and remanded on

Accordingly, the equities tip in Hope Center's favor.

d. Whether injunctive relief is in the public interest

"The public interest analysis for the issuance of a preliminary injunction requires [the Court] to consider whether there exists some critical public interest that would be injured by the grant of preliminary relief."[164]

Preventing discrimination against protected classes is clearly an important public interest. But AMC §§ 5.20.020 and 5.20.050 do not appear to apply to Hope Center's homeless shelter. Therefore, enjoining the enforcement of those provisions against Hope Center's homeless shelter will not significantly curtail the public interest.[165] Moreover, the provision of overnight living space for homeless persons furthers the public interest. Affidavits submitted by persons who have used Hope Center's overnight living space support the conclusion that the public

---

other grounds, 138 S. Ct. 377 (2017) ("[T]he Government's interest in combating terrorism is an urgent objective of the highest order. Nonetheless, the President must exercise his authority under § 1182(f) lawfully . . . . Because the President has not done so, we cannot conclude that national security interests outweigh the harms to Plaintiffs." (quotation and citations omitted)).

[164] *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 596 F.3d 1098, 1114–15 (9th Cir. 2010), *vacated on other grounds and remanded sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012) (citation omitted).

[165] *See Hawaii* 859 F.3d at 784 (9th Cir.) ("Although we recognize that sensitive and weighty interests of national security and foreign affairs are implicated, the President must nonetheless exercise his executive power under § 1182(f) lawfully." (quotation and citation omitted)).

interest would be adversely affected if AMC §§ 5.20.020 and 5.20.050 were enforced against Hope Center.[166]

Accordingly, the public interest favors issuance of a preliminary injunction.

## CONCLUSION

In light of the foregoing, IT IS ORDERED as follows:

Anchorage's Motion for Federal Abstention at Docket 43 is DENIED.

Anchorage's Motion to Stay Proceedings Pending Resolution of Defendants' Motion for Abstention at Docket 44 is DENIED as moot.

Hope Center's Motion to Supplement or for Judicial Notice at Docket 79 is GRANTED as to Hope Center's request to supplement the record.

Hope Center's Motion for Preliminary Injunction at Docket 29 is GRANTED with respect to its homeless shelter and IT IS ORDERED as follows:

PRELIMINARY INJUNCTION

(1) This Order applies to all named Defendants, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Defendants who receive actual notice of this Order.

(2) The above-described Defendants and persons are temporarily enjoined from enforcing Anchorage Municipal Code § 5.20.050 and § 5.20.020 as applied to the provision of overnight living space to homeless persons by Hope Center and

---

[166] *See* Docket 34 (S.D. Decl.); Docket 35 (G.O. Decl.); Docket 36 (F.S. Decl.).

its agents, including its right to post its desired policies (including Exhibit 3 to the Verified Complaint), and to open its overnight shelter only to persons who were determined to be female at birth.

(3) The above-described Defendants and persons are enjoined from enforcing Anchorage Municipal Code § 5.20.050(A)(2)(b) as applied to the right of the Hope Center to post and discuss its desired policies (including Exhibit 3 to the Verified Complaint) with respect to its overnight homeless shelter.

 (4) This Preliminary Injunction is effective as of the date of this Order and shall remain in place during this litigation unless and until the Court orders otherwise.

(5) The Court issues this preliminary injunction without a bond or other security.[167]


DATED this 9th day of August, 2019, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[167] Based on the Court's evaluation of the public interest in this case, the Court waives the bond requirement. *See Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005).